UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

FREMONT REORGANIZING )
CORPORATION, )
 )
Plaintiff, )
 )
v. ) No.
 )
RONNIE DUKE, RYAN ZUNDEL, BILL )
WELLS, WILLINEVAH RICHARDSON, )
ANTHONY PETERS, BRYAN STURGEON, )
AMERICAN NATIONWIDE MORTGAGE )
COMPANY, APEX FINANCIAL GROUP, )
INC., d/b/a AAPEX MORTGAGE )
CORPORATION, CBB, INC. d/b/a ) JURY TRIAL DEMANDED
BRETLIN HOME MORTGAGE, FIRST )
ESCROW COMPANY, LLC, HARDCORE )
MOTOR SPORTS, LLC, HARDCORE )
RACING, INC., JS REALTY LLC, LAWYERS )
ESCROW COMPANY, LIBERTY TITLE AND )
ESCROW SERVICES LLC, MOTORCITY )
FINANCIAL SERVICES, NATIONS TITLE )
OF OHIO, NORTH AMERICAN HOME )
FUNDING, INC., OWNER REALTY.COM, )
PREMIER MORTGAGE FUNDING, INC., )
QUOTEMEARATE.COM, INC., REAL )
ESTATE ONE, INC., SPECIALTY )
HOLDINGS, INC., ANDREW AUTY, )
TIMOTHY BAKER, MELISSA BASTIEN, )
HUSSEIN ABDUL-MAJID BAZZI )
a/k/a SAM BAZZI, ALI BAYDOUN, )
JAY BAYDOUN a/k/a JALAL BOYDOUIN, )
CHEA BENNETT, MORGAN BEVENSEE, )
KEVIN BOS, LISA BOS, ROBERT )
BRIERLEY, BYRON DEES, )
FRANK GENDERNALIK, SUSAN )
GENDERNALIK, RAY HALL, )
HUGH BRADLEY JAMES, KIM KENT, )
DAVID LARA, HAROLD LARSEN, )
DANNY LEY, PATRICK LLOYD, )
JOSE MARTINEZ, JOHN MAYER, KATHY )
MCCUTCHEON a/k/a KATHY SIZEMORE, )

| | |
|---|---|
| APRIL MILLER, COLLETTE | ) |
| MILLITELLO, JOSEPH MILLITELLO, | ) |
| PAUL MORRIS, ADELBERT MOSS, | ) |
| BRYAN MURPHY, DANIELLE NAPPER, | ) |
| SUZANNE NICHOLAS, DANIEL PANKO, | ) |
| KATHLEEN POUNDS, LARRY RIDEOUT, | ) |
| RICARDO RODRIGUEZ, FRANK RAY | ) |
| SCHAFER, JR., JEFF SCHUCK, RACHEL | ) |
| SEMAN, MICHAEL SHILAKES, | ) |
| JAMIE SWEENEY, RONALD TALASKI, JR., | ) |
| MITCHELL TOMCSIK, NICOLE | ) |
| TURCHECK, ROBERT TURCHECK, LINDA | ) |
| WAHLER, DONNA WALBROOK, PAUL | ) |
| WHITESIDE, JEREMY YALKIN, KASSEM | ) |
| ZREIK, and FIDELITY NATIONAL TITLE | ) |
| INSURANCE COMPANY, | ) |
| | ) |
| Defendants. | ) |

## COMPLAINT

Plaintiff, Fremont Reorganizing Corporation ("Fremont"), for its Complaint states as follows:

1.     This action is brought to recover damages due Fremont and to compensate it for losses caused by the misconduct of numerous persons and entities associated with Ronnie Duke. The illegal conduct masterminded by Duke began in 2003 and extended until 2007. During that period, Duke, assisted by other defendants, devised and implemented a scheme to defraud Fremont and other mortgage lenders and to obtain money by means of false and fraudulent pretenses and representations. Duke's scheme involved using straw buyers to apply for mortgage loans for residential real estate transactions that may or may not have involved the actual transfer of ownership of the property. Duke and others used the mortgage loan proceeds from these transactions to enrich themselves and to perpetuate the scheme.

2

2.      This action is also brought against defendant Fidelity National Title Insurance Company to recover damages arising from the fraud of one of its issuing agents and from its refusal to indemnify Fremont pursuant to closing protection letters issued in connection with certain of the mortgage loans involved in the scheme.

## THE PARTIES

### Plaintiff

3.      Fremont is a California corporation with its principal place of business in Anaheim, California.  Fremont was formerly known as Fremont Investment & Loan.  Prior to July 2008, Fremont was primarily engaged in the business of originating 1-4 family sub-prime residential mortgage loans for sale into the secondary market.

### Defendants Duke, Zundel, Wells, Richardson, Peters and Sturgeon

4.      Defendant Ronnie Duke is a citizen of the state of Michigan.  During all times relevant to the claims alleged, Duke used numerous alias identities, including "Ronnie Edward Duke" and "Ron Edwards" and others unknown to Fremont (hereinafter, "Duke" refers to Ronnie Duke, inclusive of any other identities he may have used as aliases).  In 2006, in *In the Matter of Ronnie Duke,* agency number 05-506-MB, enforcement case number 05-3877 (State of Michigan Department of Labor & Economic Growth, Office of Financial and Insurance Services), a Consent Order of Prohibition was entered prohibiting Duke from being employed by, an agent of, or control person of a licensee or registrant under the Michigan Mortgage Brokers, Lenders, and Servicers Licensing Act, MCL 445.1651, *et seq.*, or a licensee or registrant under a financial licensing act.

3

5.      Defendant Ryan Zundel ("Zundel") is a citizen of the State of Michigan.  During some or all of the relevant time herein, Zundel was associated with Duke and assisted him in connection with the scheme to defraud.

6.      Defendant Bill Wells ("Wells") is a citizen of the State of Michigan.  During some or all of the relevant time herein, Wells was associated with Duke and assisted him in connection with the scheme to defraud.

7.      Defendant Willinevah Richardson ("Richardson") is a citizen of the State of Michigan.  During some or all of the relevant time herein, Wells was associated with Duke and assisted him in connection with the scheme to defraud.

8.      Defendant Anthony Peters ("Peters") is a citizen of the State of Michigan.  During some or all of the relevant time herein, Peters was associated with Duke and assisted him in connection with the scheme to defraud.

9.      Defendant Bryan Sturgeon ("Sturgeon") is a citizen of the State of Michigan.  During some or all of the relevant time herein, Sturgeon was employed as a loan officer at CBB, Quotemearate, and Premier and was associated with Duke and assisted him in connection with the scheme to defraud.

**<u>Duke-Owned Entity Defendants</u>**

10.      Defendant Hardcore Racing, Inc. ("Hardcore Racing") is a Michigan corporation with its principal place of business in Ferndale, Michigan.  During some or all of the relevant time herein, Duke owned and/or controlled Hardcore Racing and invested proceeds from his fraudulent scheme in Hardcore Racing, both to maintain the operations of Hardcore Racing and as a means of laundering the illegal proceeds from the scheme.

11.    Defendant Hardcore Motorsports LLC ("Hardcore Motorsports") is a Michigan limited liability corporation with its principal place of business in Novi, Michigan.  During some or all of the relevant time herein, Duke, Wells, and Richardson owned and/or controlled Hardcore Motorsports and invested proceeds from Duke's fraudulent scheme in Hardcore Motorsports, both to maintain the operations of Hardcore Motorsports and as a means of laundering the illegal proceeds from the scheme.

12.    Defendant Specialty Holdings, Inc. ("Specialty Holdings") is a Michigan corporation with its principal place of business in Bloomfield Hills, Michigan.  During some or all of the relevant time herein, Duke owned Specialty Holdings.

**Real Estate Agency Defendants**

13.    In connection with the scheme to defraud, Duke and other defendants used real estate agencies as vehicles for identifying properties to use as subjects for mortgage loan applications.  During some or all of the relevant time herein, each of these agencies were either owned or controlled by a member of Duke's criminal enterprise or employed one or more members of Duke's criminal enterprise as real estate agents.  Those real estate agencies included:

   a.    Defendant Owner Realty.com, LLC ("Owner Realty"), a Michigan limited liability corporation with its principal place of business in Clinton Township, Michigan.  During some or all of the relevant time herein, Defendant Timothy Baker owned and controlled Owner Realty and Owner Realty employed Defendant Michael Shilakes as a real estate agent.

   b.    Defendant Real Estate One, Inc. ("Real Estate One"), a Michigan corporation with its principal place of business in Southfield, Michigan.  During some or all of the relevant time herein, Real Estate One employed Defendants Jamie Sweeney and Sam Bazzi as real estate agents.

14.     Defendant JS Realty LLC ("JS Realty"), is a Michigan limited liability corporation with its principal place of business in Grosse Ile, Michigan.  JS Realty is owned and controlled by Defendant Nicole Turcheck.  Nicole Turcheck purchased an interest in JS Realty in August 2006 and funneled and invested money she obtained from the scheme to defraud in JS Realty.

**Mortgage Brokerage Defendants**

15.     In connection with the scheme to defraud, Duke and other defendants used mortgage brokerages as vehicles through which false and fraudulent loan applications were submitted to lenders.  During some or all of the relevant times herein, each of these mortgage brokerages employed one or more members of Duke's criminal enterprise as loan officers.  Those mortgage brokerages included:

> a.     Defendant Apex Financial Group, Inc. d/b/a Aapex Mortgage Corp. ("Aapex"), a Florida corporation with its principal place of business in Valrico, Florida.  During some or all of the relevant time herein, Aapex employed Defendant Nicole Turcheck as a loan officer.

> b.     Defendant American Nationwide Mortgage Company, Inc. ("American Nationwide"), a Florida corporation with its principal place of business in Tampa, Florida.  During some or all of the relevant time herein, American Nationwide employed Defendant Harold Larsen as a loan officer.

> c.     Defendant CBB Inc. d/b/a Bretlin Home Mortgage ("CBB"), a Michigan corporation with its principal place of business in Lansing, Michigan. During some or all of the relevant time herein, CBB employed Defendants Ricardo Rodriguez and Bryan Sturgeon as loan officers.

> d.     Defendant North American Home Funding, Inc. ("North American"), a Florida corporation with its principal place of business in Westlake, California.  During some or all of the relevant time herein, North American employed Defendant Chea Bennett as a loan officer.

e.   Defendant Premier Mortgage Funding, Inc. ("Premier"), a Florida
corporation with its principal place of business in Florida.  During some or
all of the relevant time herein, Premier employed Defendants Bryan
Sturgeon and Chea Bennett as loan officers.

f.   Defendant Quotemearate.com ("Quotemearate"), a Texas corporation with
its principal place of business in Houston, Texas.  During some or all of
the relevant time herein, Quotemearate employed Defendant Bryan
Sturgeon as a loan officer.

## Closing and/or Issuing Agent Defendants

16.   In connection with the scheme to defraud, Duke and other defendants established,

acquired, owned, and/or controlled closing and/or issuing agents used as vehicles through which

fraudulent real estate purchase and sale transactions were closed.  Those issuing agents included:

a.   Defendant First Escrow Company LLC ("First Escrow"), a Michigan
limited liability corporation with its principal place of business in Taylor,
Michigan.  During some or all of the relevant time herein, Duke was the
resident agent for First Escrow.

b.   Defendant Lawyers Escrow Company ("Lawyers Escrow"), a Michigan
corporation with its principal place of business in Michigan.  During some
or all of the relevant time herein, Duke and Richardson acted as notaries
for loan transactions closed through Lawyers Escrow.

c.   Defendant Liberty Title and Escrow Services LLC ("Liberty Title"), an
Ohio limited liability corporation with its principal place of business in
Swartz Creek, Michigan.  During some or all of the relevant time herein,
Duke (through his alias Ron Edwards) was the resident agent for Liberty
Title.

d.   Defendant MotorCity Financial Services ("MotorCity"), a Michigan
limited liability corporation with its principal place of business in
Bingham Farms, Michigan.  During some or all of the relevant time herein,
Peters was a member of MotorCity.

e.   Defendant Nations Title of Ohio ("Nations Title"), a Michigan corporation
with its principal place of business in East Lansing, Michigan.  During
some or all of the relevant time herein, Defendant Robert Brierley was the
resident agent for Nations Title.

**Individual Defendants**

17.     Defendant Andrew Auty ("Auty") is a citizen of the State of Michigan.  During some or all of the relevant time herein, Auty was associated with Duke and assisted him in connection with the scheme to defraud.

18.     Defendant Timothy Baker ("Baker") is a citizen of the State of Michigan.  During some or all of the relevant time herein, Baker owned and controlled Owner Realty and was associated with Duke and assisted him in connection with the scheme to defraud.  Baker was also an appraiser employed by Key Appraisers.com LLC.

19.     Defendant Hussein Abdul-Majid Bazzi a/k/a Sam Bazzi ("Bazzi") is a citizen of the State of Michigan.  During some or all of the relevant time herein, Bazzi was a real estate agent for Real Estate One and was associated with Duke and assisted him in connection with the scheme to defraud by agreeing to act as a property locator for the scheme, as described in paragraph 92 below.  Bazzi has pled guilty to wire fraud in violation of 18 U.S.C. § 1343 in the United States District Court for the Eastern District of Michigan in the matter *United States v. Bazzi*, No. 2:09-cr-20365 (E.D. Mich.), in connection with the scheme to defraud.

20.     Defendant Melissa Bastien ("Bastien") is a citizen of the State of Michigan.  During some or all of the relevant time herein, Bastien was associated with Duke and assisted him in connection with the scheme to defraud by agreeing to act as a loan processor for the scheme, as described in paragraph 97 below.  Bastien has pled guilty to wire fraud in violation of 18 U.S.C. § 1343 in the United States District Court for the Eastern District of Michigan in the matter *United States v. Bastien*, No. 2:09-cr-20241 (E.D. Mich.), in connection with the scheme to defraud.

21.     Defendant Ali Baydoun ("Ali Baydoun") is a citizen of the State of Michigan. During some or all of the relevant time herein, Ali Baydoun was associated with Duke and assisted him in connection with the scheme to defraud.

22.     Defendant Jay Baydoun a/k/a Jalal Boydouin ("Jay Baydoun") is a citizen of the State of Michigan.   During some or all of the relevant time herein, Jay Baydoun was associated with Duke and assisted him in connection with the scheme to defraud.

23.     Defendant Chea Bennnett ("Bennett") is a citizen of the State of Michigan. During some or all of the relevant time herein, Bennett was employed as a loan officer at Premier and North American and was associated with Duke and assisted him in connection with the scheme to defraud.

24.     Defendant Morgan Bevensee ("Bevensee") is a citizen of the State of Michigan. During some or all of the relevant time herein, Bevensee was associated with Duke and assisted him in connection with the scheme to defraud.

25.     Defendant Kevin Bos ("Kevin Bos") is a citizen of the State of Michigan.   During some or all of the relevant time herein, Kevin Bos was associated with Duke and assisted him in connection with the scheme to defraud.

26.     Defendant Lisa Bos ("Lisa Bos") is a citizen of the State of Michigan.   During some or all of the relevant time herein, Lisa Bos was associated with Duke and assisted him in connection with the scheme to defraud.

27.     Defendant Robert Brierley ("Brierley") is a citizen of the State of Michigan. During some or all of the relevant time herein, Brierley was associated with Duke and assisted him in connection with the scheme to defraud.

28.     Defendant Byron Dees ("Dees") is a citizen of the State of Michigan.  During some or all of the relevant time herein, Dees was associated with Duke and assisted him in connection with the scheme to defraud.

29.     Defendant Frank Gendernalik ("Frank Gendernalik") is a citizen of the State of Michigan.  During some or all of the relevant time herein, Frank Gendernalik was associated with Duke and assisted him in connection with the scheme to defraud.

30.     Defendant Susan Gendernalik ("Susan Gendernalik") is a citizen of the State of Michigan.  During some or all of the relevant time herein, Gendernalik was associated with Duke and assisted him in connection with the scheme to defraud.

31.     Defendant Ray Hall ("Hall") is a citizen of the State of Michigan.  During some or all of the relevant time herein, Hall was associated with Duke and assisted him in connection with the scheme to defraud.

32.     Defendant Hugh Bradley James ("James") is a citizen of the State of Michigan.  During some or all of the relevant time herein, James was associated with Duke and assisted him in connection with the scheme to defraud.

33.     Defendant Kim Kent ("Kent") is a citizen of the State of Michigan.  During some or all of the relevant time herein, Kent was associated with Duke and assisted him in connection with the scheme to defraud.

34.     Defendant David Lara ("Lara") is a citizen of the State of Michigan.  During some or all of the relevant time herein, Lara was associated with Duke and assisted him in connection with the scheme to defraud.

35.      Defendant Harold Larsen ("Larsen") is a citizen of the State of Michigan.  During some or all of the relevant time herein, Larsen was employed as a loan officer at American Nationwide and was associated with Duke and assisted him in connection with the scheme to defraud.

36.      Defendant Danny Ley ("Ley") is a citizen of the State of Michigan.  During some or all of the relevant time herein, Ley was associated with Duke and assisted him in connection with the scheme to defraud.

37.      Defendant Patrick Lloyd ("Lloyd") is a citizen of the State of Michigan.  During some or all of the relevant time herein, Lloyd was associated with Duke and assisted him in connection with the scheme to defraud.

38.      Defendant Jose Martinez ("Martinez") is a citizen of the State of Michigan.  During some or all of the relevant time herein, Martinez was associated with Duke and assisted him in connection with the scheme to defraud.

39.      Defendant John Mayer ("Mayer") is a citizen of the State of Michigan.  During some or all of the relevant time herein, Mayer was associated with Duke and assisted him in connection with the scheme to defraud.

40.      Defendant Kathy McCutcheon a/k/a Kathy Sizemore ("McCutcheon") is a citizen of the State of Michigan.  During some or all of the relevant time herein, McCutcheon was associated with Duke and assisted him in connection with the scheme to defraud by agreeing to act as a loan processor for the scheme, as described in paragraph 97 below.  McCutcheon has pled guilty to wire fraud in violation of 18 U.S.C. § 1343 in the United States District Court for

the Eastern District of Michigan in the matter *United States v. McCutcheon*, No. 2:09-cr-20204 (E.D. Mich.), in connection with the scheme to defraud.

41.     Defendant April Miller ("Miller") is a citizen of the State of Michigan. During some or all of the relevant time herein, Miller was associated with Duke and assisted him in connection with the scheme to defraud.

42.     Defendant Collette Millitello ("Collette Millitello") is a citizen of the State of Michigan. During some or all of the relevant time herein, Collette Millitello was associated with Duke and assisted him in connection with the scheme to defraud.

43.     Defendant Joseph Millitello ("Joseph Millitello") is a citizen of the State of Michigan. During some or all of the relevant time herein, Joseph Millitello was associated with Duke and assisted him in connection with the scheme to defraud.

44.     Defendant Paul Morris ("Morris") is a citizen of the State of Michigan. During some or all of the relevant time herein, Morris was associated with Duke and assisted him in connection with the scheme to defraud.

45.     Defendant Adelbert Moss ("Moss") is a citizen of the State of Michigan. During some or all of the relevant time herein, Moss was associated with Duke and assisted him in connection with the scheme to defraud.

46.     Defendant Bryan Murphy ("Murphy") is a citizen of the State of Michigan. During some or all of the relevant time herein, Murphy was associated with Duke and assisted him in connection with the scheme to defraud.

47.     Defendant Danielle Napper ("Napper") is a citizen of the State of Michigan. During some or all of the relevant time herein, Napper was associated with Duke and assisted him in connection with the scheme to defraud.

48.     Defendant Suzanne Nicholas ("Nicholas") is a citizen of the State of Michigan. During some or all of the relevant time herein, Nicholas was associated with Duke and assisted him in connection with the scheme to defraud.

49.     Defendant Daniel Panko ("Panko") is a citizen of the State of Michigan.  During some or all of the relevant time herein, Panko was associated with Duke and assisted him in connection with the scheme to defraud.

50.     Defendant Kathleen Pounds ("Pounds") is a citizen of the State of Michigan. During some or all of the relevant time herein, Pounds was associated with Duke and assisted him in connection with the scheme to defraud.

51.     Defendant Larry Rideout ("Rideout") is a citizen of the State of Michigan.  During some or all of the relevant time herein, Rideout was associated with Duke and assisted him in connection with the scheme to defraud.

52.     Defendant Ricardo Rodriguez ("Rodriguez") is a citizen of the State of Michigan. During some or all of the relevant time herein, Rodriguez was employed as a loan officer at CBB and was associated with Duke and assisted him in connection with the scheme to defraud.

53.     Defendant Frank Ray Schafer, Jr. ("Schafer") is a citizen of the State of Michigan. During some or all of the relevant time herein, Schafer was associated with Duke and assisted him in connection with the scheme to defraud.

54.     Defendant Jeff Schuck ("Schuck") is a citizen of the State of Michigan.  During some or all of the relevant time herein, Schuck was associated with Duke and assisted him in connection with the scheme to defraud.

55.     Defendant Rachel Seman ("Seman") is a citizen of the State of Michigan.  During some or all of the relevant time herein, Seman was associated with Duke and assisted him in connection with the scheme to defraud.

56.     Defendant Michael Shilakes ("Shilakes") is a citizen of the State of Michigan. During some or all of the relevant time herein, Shilakes was a real estate agent for Owner Realty and was associated with Duke and assisted him in connection with the scheme to defraud.

57.     Defendant Jamie Sweeney ("Sweeney") is a citizen of the State of Michigan. During some or all of the relevant time herein, Sweeney was a real estate agent for Real Estate One and was associated with Duke and assisted him in connection with the scheme to defraud.

58.     Defendant Ronald Talaski, Jr. ("Talaski") is a citizen of the State of Michigan. During some or all of the relevant time herein, Talaski was associated with Duke and assisted him in connection with the scheme to defraud.

59.     Defendant Mitchell Tomcsik ("Tomcsik") is a citizen of the State of Michigan. During some or all of the relevant time herein, Tomcsik was associated with Duke and assisted him in connection with the scheme to defraud.

60.     Defendant Nicole Turcheck ("Nicole Turcheck") is a citizen of the State of Michigan.  During some or all of the relevant time herein, Nicole Turcheck was employed as a loan officer at Aapex and was associated with Duke and assisted him in connection with the scheme to defraud.  Nicole Turcheck currently owns and controls JS Realty.

61.     Defendant Robert Turcheck ("Robert Turcheck") is a citizen of the State of Michigan.  During some or all of the relevant time herein, Robert Turcheck was associated with Duke and assisted him in connection with the scheme to defraud.

62.     Defendant Linda Wahler ("Wahler") is a citizen of the State of Michigan.  During some or all of the relevant time herein, Wahler was associated with Duke and assisted him in connection with the scheme to defraud.

63.     Defendant Donna Walbrook ("Walbrook") is a citizen of the State of Michigan. During some or all of the relevant time herein, Walbrook was associated with Duke and assisted him in connection with the scheme to defraud.

64.     Defendant Paul Whiteside ("Whiteside") is a citizen of the State of Michigan. During some or all of the relevant time herein, Whiteside was associated with Duke and assisted him in connection with the scheme to defraud.

65.     Jeremy Yalkin ("Yalkin") is a citizen of the State of Michigan.  During some or all of the relevant time herein, Yalkin was associated with Duke and assisted him in connection with the scheme to defraud.

66.     Defendant Kassem Zreik ("Zreik") is a citizen of the State of Michigan.  During some or all of the relevant time herein, Zreik was employed as an appraiser by Desktop Appraisal Service LLC and was associated with Duke and assisted him in connection with the scheme to defraud.

**Defendant Fidelity National Title Insurance Company**

67.     Defendant Fidelity National Title Insurance Company ("Fidelity"), a wholly owned subsidiary of Fidelity National Financial, Inc., is a title insurance company incorporated in

California and headquartered in Jacksonville, Florida.  From 2004 through 2007, Fidelity,

through its agents, issued closing protection letters ("CPLs"), title commitments, and/or Loan

Policies of Title Insurance to Fremont in connection with mortgage loan transactions connected

to the scheme to defraud.

## JURISDICTION AND VENUE

68.     This Court has subject matter jurisdiction over the claims asserted herein pursuant

to 28 U.S.C. § 1331 and the Racketeer Influenced and Corrupt Organizations Act ("RICO"), 18

U.S.C. § 1961, *et seq.*, and pursuant to 28 U.S.C. § 1367(a).

69.     This Court has personal jurisdiction over all Defendants pursuant to Mich. Comp.

Laws §§ 600.701, 600.705, 600.711, and 600.715 , and also has personal jurisdiction over all

Defendants against whom RICO claims are alleged pursuant to 18 U.S.C. § 1965.

70.     Venue is proper in this district under 28 U.S.C. § 1391 and 18 U.S.C. § 1965.

## GENERAL FACTUAL ALLEGATIONS

**Fremont**

71.     Fremont General Corporation was a financial services holding company with $8.8

billion in total assets as of September 30, 2007.  Fremont General Corporation conducted its

financial services business through its wholly owned, indirect industrial bank subsidiary,

Fremont.  Fremont was primarily engaged in the business of originating 1-4 family sub-prime

residential mortgage loans for sale into the secondary market.  Fremont General Corporation filed

a voluntary petition for relief under Chapter 11 of the United States Bankruptcy Code on June 18,

2008, thereby commencing Bankruptcy Case No. 8:08-bk-13421-ES in the United States

Bankruptcy Court, Central District of California, Santa Ana Division.

72.     On July 28, 2008, Fremont General Corporation completed the sale of Fremont's

retail bank deposits and certain other assets.  Immediately following the sale, Fremont

relinquished its federal deposit insurance certificate to the Federal Deposit Insurance Corporation

and surrendered its industrial bank charter to the California Department of Financial Institutions.

In connection with the surrender of its bank charter, Fremont also changed its name from

"Fremont Investment & Loan" to "Fremont Reorganizing Corporation."

73.     Fremont's primary source of loans was via contractual relationships with third-

party, licensed mortgage brokerages, commonly referred to as a wholesale lending channel.  In

wholesale lending, representatives of the mortgage brokerage (referred to as mortgage brokers,

loan agents, or loan officers) have the direct relationship with the borrower, and present loan

options to the borrower based on wholesale lending programs offered by various lenders, such as

Fremont, with whom the independent mortgage brokerage maintains relationships.

**Operation of the Mortgage Fraud Scheme**

74.     Sometime in or around December 2001, Duke created Specialty Holdings, Inc.

("Specialty Holdings") and incorporated it in Michigan.  Duke was the President, Secretary and

Treasurer of Specialty Holdings.  On information and belief, Specialty Holdings was created

ostensibly to act as an "investment club" that would purchase residential properties, manage the

properties, and rent them out.  In fact, however, Specialty Holdings operated as a vehicle to

defraud mortgage lenders out of tens of millions of dollars.

75.     In general, Duke's mortgage fraud scheme worked as follows:  Duke or someone at his direction would locate residential real properties for sale and arrange for a nominal or straw buyer to purchase a property and obtain a loan from a financial institution to finance the purchase.  In some instances, the mortgage loan proceeds would be used to actually purchase the property in the name of the straw buyer – these mortgage loans are referred to in this Complaint as straw loans.  In other instances, the mortgage loan proceeds were not used to purchase the property at all, but instead were stolen and used to enrich the participants in the scheme – these mortgage loans are referred to in this Complaint as ghost loans.  In the case of both straw and ghost loans, Duke and others under his direction and control would create materially false and fraudulent documents in order to obtain mortgage loans, including but not limited to:  loan applications, lease agreements, verifications of deposit, purchase agreements, warranty deeds, mortgages, and mortgage notes.

**Straw Loans**

76.     In the case of a straw loan, Duke or someone at his direction would recruit and pay a person with an acceptable credit history (a "straw buyer") to act as the borrower on the transaction.  One of the members of Duke's criminal enterprise, working as a loan processor or loan officer, would next prepare a loan application to submit to a mortgage lender for funding.  In some instances, the loan application would indicate that the straw buyer intended to use the property as a primary residence, but that statement would in fact not be true.

77.     The loan applications for straw loans indicated that the 20% down payment to be paid to the property's seller would be paid from the straw buyer's own funds.  These representations were materially false and fraudulent because the funds from the down payment

would be paid from the proceeds of another mortgage loan obtained by fraud in connection with a wholly different property, or with other funds provided by Duke or others under his direction and control.

78.     The loan applications for straw loans were also materially false and fraudulent because they inflated the income of the straw buyer.

79.     In some instances, a verification of deposit ("VOD") would be submitted with the loan application for a straw loan.  The VOD represented that the straw buyer had a bank account with a large balance.  These representations were materially false and fraudulent because the account balance had been inflated by a temporary transfer into the account of funds not belonging to the straw buyer.

80.     In connection with straw loans, Duke or others under his direction and control would arrange for the loan to close and for legal title for the subject property to transfer from the seller to the straw buyer through a warranty deed.  Duke and others under his direction and control, acting through Specialty Holdings, would then control the subject property and rent it to third-party tenants.  Participants in the scheme would refer to these properties as "controlled" properties.

**Ghost Loans**

81.     In the case of a ghost loan, as in the case of a straw loan, Duke or others at his direction would recruit and pay a straw buyer to act as the borrower on the transaction.

82.     In the case of a ghost loan, unlike a straw loan, there was no actual sale or purchase of the subject property intended.  Thus, the agreement to purchase the subject property was materially false and fraudulent.  The nominal seller identified in a purchase agreement for a

ghost loan was either: (a) a straw buyer from a straw loan transaction involving the subject property; or (b) the true owner of the subject property who was unaware of any purported sale of the property.

83.     As in the case of a straw loan, a member of the Duke criminal enterprise, working as a loan processor or loan officer, would prepare a loan application to submit to a mortgage lender for funding.  The loan application submitted to a lender for a ghost loan would indicate that the straw buyer intended to use the property either as an investment or a primary residence, but neither would in fact be true.  If the loan application indicated that the property would be used as an investment, Duke or others at his direction would prepare and submit to the lender a lease agreement purportedly between the straw buyer and a third-party tenant showing that the straw buyer would receive a stream of rental income from the property.  These lease agreements were false and fraudulent because the straw buyer had no intention of leasing the property and there was no third-party tenant.

84.     In the case of a ghost loan, Duke or someone at his direction would obtain a cashier's check purporting to represent the 20% down payment to the seller, but the cashier's check would subsequently be cancelled and no transfer of funds would occur.

85.     The loan applications for ghost loans were also materially false and fraudulent because, among other things, they inflated the income of the straw buyer.

86.     As in the case of a straw loan, in some instances, a VOD would be submitted with the loan application for a ghost loan.  The VOD represented that the straw buyer had a bank account with a large balance.  These representations were materially false and fraudulent because

the account balance had been inflated by a temporary transfer into the account of funds not belonging to the straw buyer.

87.    In the case of a ghost loan, Duke or someone at his direction working at a Duke owned and controlled closing agent would fabricate a counterfeit warranty deed purporting to transfer title from the nominal seller to the straw buyer and forge signatures of both buyer and seller on the deed.  These warranty deeds were never recorded in the county register of deeds.

88.    In the case of a ghost loan, Duke and others working at Duke owned and controlled closing agents knew mortgage and mortgage loan documents would be created by the mortgage lender that purported to convey a mortgage interest in the property to the lender to secure the straw buyer's debt to the lender.  Duke or someone at his direction would forge signatures on the mortgages and mortgage notes.  Duke and others working at Duke owned and controlled closing agents would not record these mortgages and mortgage loans in the county register of deeds and, consequently, the mortgage lenders in ghost loan transactions would not obtain a mortgage interest in the subject property.

89.    In the case of a ghost loan, Duke or someone at his direction working at a Duke owned and controlled closing agent would fabricate HUD-1 settlement statements to give the appearance that a closing of the purchase transaction had occurred and the property had been conveyed; however, there was no actual transfer of funds from the straw buyer to the nominal seller and no actual transfer of legal title from the nominal seller to the straw buyer.

90.    In the case of a ghost loan, Duke and others would use the funds advanced by the mortgage lender to:  (a) enrich themselves and other participants in the scheme; (b) make down payments in connection with straw loans; (c) make some monthly payments on both straw and

ghost loans; (d) invest in Hardcore Racing and Hardcore Motorsports; and (e) otherwise continue the scheme.

**Roles of the Participants in the Scheme**

91.     Each of the participants in the scheme would perform one or more roles in connection with obtaining both straw and ghost loans.  These roles included, but were not limited to:  property locator, recruiter, straw buyer, appraiser, document counterfeiter, loan processor, mortgage broker or loan officer, closing and/or issuing agent.  *See* Exhibit A hereto.

92.     Property locators were generally licensed real estate agents who would locate homes to be purchased through straw loans in the names of straw buyers.  Property locators involved in the scheme knew the straw buyers were merely posing as borrowers for purposes of obtaining mortgage loans and that the 20% down payments advanced by the straw buyers were not paid with the straw buyers' own funds.  Defendants Baker, Bazzi, Shilakes, Sweeney, and Robert Turcheck acted as property locators in connection with the scheme.

93.     Recruiters were involved in recruiting persons to act as straw buyers for the properties in both straw and ghost loan transactions.  Recruiters involved in the scheme knew the straw buyers were merely posing as borrowers for purposes of obtaining mortgage loans.  Defendants Jay Baydoun, Sweeney, and Robert Turcheck acted as recruiters in connection with the scheme.

94.     Straw buyers were paid a substantial amount of money to pose as borrowers in both straw and ghost loan transactions.  Straw buyers would allow their names to be used on loan applications and other documents knowing they were merely posing as borrowers for purposes of obtaining mortgage loans.  Defendants Auty, Bevensee, Kevin Bos, Lisa Bos, Dees, Frank

Gendernalik, Susan Gendernalik, Hall, James, Kent, Lara, Ley, Lloyd, Martinez, Mayer, Miller, Collette Millitello, Joseph Millitello, Morris, Moss, Murphy, Nicholas, Panko, Pounds, Rideout, Schafer, Schuck, Talaski, Tomcsik, Wahler, Whiteside, and Yalkin acted as straw buyers in connection with the scheme.

95.    Appraisers prepared fraudulent property appraisals for ghost loan transactions to give the appearance that the property was the subject of a purchase transaction. Appraisers involved in the scheme knew no actual purchase of the property would transpire. Defendants Baker and Zreik acted as appraisers in connection with the scheme.

96.    Document counterfeiters were involved in fabricating documents and forging signatures in connection with both straw and ghost loan transactions, including, but not limited to: loan applications, lease agreements, VODs, warranty deeds, mortgages, mortgage notes, closing protection letters, and HUD-1 settlement statements. Document counterfeiters in the scheme knew the information included in the documents they prepared was false and fraudulent. Defendants Bastien, Ali Baydoun, Jay Baydoun, Bennett, Brierley, Duke, Larsen, McCutcheon, Napper, Peters, Richardson, Rodriguez, Sturgeon, Nicole Turcheck, Walbrook, Wells, and Zundel acted as document counterfeiters in connection with the scheme.

97.    Loan processors completed loan applications on behalf of straw buyers, collected and organized documents and information for inclusion in loan packages, participated in the submission of loan packages to the mortgage lenders, and communicated with mortgage lenders about loan applications. Loan processors involved in the scheme knew that, among other things, the straw buyers were merely posing as borrowers for purposes of obtaining mortgage loans, the down payments identified in the loan applications would not be paid from the straw buyers' own

23

funds, the straw buyers had no intention of either renting the property or occupying it themselves, and lease agreements and VODs were false and fraudulent. Defendants Ali Baydoun, Bastien, McCutcheon, Seman, and Walbrook acted as loan processors in connection with the scheme.

98.     Mortgage brokers and loan officers also participated in the submission of loan applications and loan packages to the mortgage lenders and communicated with the mortgage lenders. Mortgage brokers or loan officers involved in the scheme knew that, among other things, the straw buyers were merely posing as borrowers for purposes of obtaining mortgage loans, the down payments identified in the loan applications would not be paid from the straw buyers' own funds, the straw buyers had no intention of either renting the property or occupying it themselves, and lease agreements and VODs were false and fraudulent. Defendants Jay Baydoun, Bennett, Larsen, Napper, Rodriguez, Sturgeon, Nicole Turcheck, and Zundel acted as mortgage brokers or loan officers in connection with the scheme.

99.     Closing and/or issuing agents were involved in closing straw loan transactions. They were also involved in documenting ghost loan transactions to give the appearance that the ghost loans were actually closed. Defendants First Escrow, Lawyers Escrow, Liberty Title, MotorCity, Nations Title, Brierley, Duke, Peters, Richardson, and Wells acted as closing and/or issuing agents in connection with the scheme.

**Loans Funded by Fremont**

100.     From 2004 to at least 2007, Duke or someone at his direction applied for and obtained at least fifty-nine (59) loans, both straw and ghost, from Fremont. Fremont is currently investigating the potential involvement of Duke or someone at his direction in applying for and

obtaining up to seventy-seven (77) other straw and/or ghost loans from Fremont during the relevant time.

101.    Based on the investigation to date, the following loans funded by Fremont were straw loans:

| | Borrower | Date | Property Address | Amount of Loan |
|---|---|---|---|---|
| a. | Carlo Palmeri | 1/18/05 | 7285 Inkster Rd.<br>W. Bloomfield, MI 48301 | $296,000.00 |
| b. | Carlo Palmeri | 1/18/05 | 7236 Andover Dr.<br>Canton, MI 48187 | $388,000.00 |
| c. | Larry M. Yount | 10/26/05 | 7763 N. Inkster Rd.<br>Westland, MI 48185 | $161,500.00 |
| d. | Suzanne Nicholas | 11/10/05 | 9027 Potterville Rd.<br>Augusta, MI 48191 | $260,000.00 |
| e. | David Lara | 11/28/05 | 4944 Birkdale Dr.<br>Commerce Twshp, MI 48382 | $388,800.00 |
| f. | Morgan Bevensee | 12/12/05 | 802 Mt. Vernon Blvd.<br>Royal Oak, MI 48073 | $328,000.00 |
| g. | Ramon R. Lara, Jr. | 2/14/06 | 6896 Colony Dr.<br>W. Bloomfield, MI 48323 | $336,000.00 |
| h. | Collette J. Millitello<br>Joseph A. Millitello | 7/26/05 | 11856 Harbor Lane<br>Van Buren, MI 48111 | $280,000.00 |
| i. | Frank Ray Schafer II | 4/27/05 | 1546 N. Liberty St.<br>Canton, MI 48188 | $343,200.00 |
| j. | Danny Ley | 8/24/06 | 736 Miller<br>Ann Arbor, MI 48103 | $264,000.00 |
| k. | Danny Ley | 8/28/06 | 738 Miller<br>Ann Arbor, MI 48103 | $270,400.00 |

| l. | Joseph C. Joseph | 10/23/06 | 45138 Pinetree Dr.<br>Plymouth, MI 48170 | $268,000.00 |
| m. | Robert Applebee<br>Darla Applebee | 11/14/05 | 2145 Rawsonville Rd.<br>Belleville, MI 48111 | $240,000.00 |
| n. | Danny Ley | 10/25/06 | 38148 Vista Drive #30<br>Livonia, MI 48152 | $280,000.00 |
| o. | Eric Broad | 9/8/06 | 26509 Sheahan Dr.<br>Dearborn Hts, MI 48127 | $261,600.00 |
| p. | Ronnie E. Duke | 8/29/06 | 2024 Medina Dr.<br>Wixom, MI 48393 | $300,000.00 |
| q. | Brian L. Murphy<br>Donna M. Galante | 12/6/04 | 32308 Church St.<br>Rockwood, MI 48173 | $ 90,400.00 |

102.    Based on the investigation to date, the following loans funded by Fremont were

ghost loans:

| | **Borrower** | **Date** | **Property Address** | **Amount of Loan** |
|---|---|---|---|---|
| a. | Adelbert Moss | 6/8/04 | 147 Coalmont<br>Walled Lake, MI 48390 | $384,000.00 |
| b. | Susan Gendernalik | 4/8/05 | 3395 N. Maple Rd.<br>Scio, MI 48105 | $360,000.00 |
| c. | Susan Gendernalik | 4/12/05 | 5967 Lohr Lake Dr.<br>Pittsfield, MI 48108 | $353,200.00 |
| d. | Frank Ray Schafer II | 4/26/05 | 2970 Viking Dr.<br>Commerce Twshp, MI 48390 | $284,000.00 |
| e. | Frank Ray Schafer II | 4/28/05 | 44977 Middlebury Ct.<br>Canton, MI 48188 | $283,200.00 |
| f. | Byron Dees | 5/12/05 | 5127 Lake Bluff Rd.<br>W. Bloomfield, MI 48323 | $436,000.00 |

| | | | | |
|---|---|---|---|---|
| g. | Paul Morris | 5/20/05 | 21925 Rathlone Dr.<br>Novi, MI 48187 | $280,000.00 |
| h. | Brian Murphy | 6/13/05 | 1884 Magnolia Dr.<br>Commerce, MI 48390 | $496,000.00 |
| i. | Daniel M. Panko | 6/30/05 | 8545 Pineview Lake Dr.<br>Linden, MI 48451 | $206,400.00 |
| j. | Joseph A. Millitello<br>Collette J. Millitello | 7/22/05 | 48280 Gladstone<br>Canton, MI 48188 | $347,900.00 |
| k. | Jeremy Yalkin | 7/28/05 | 6618 Kings Ct.<br>W. Bloomfield, MI 48322 | $436,000.00 |
| l. | Frank Gendernalik | 7/28/05 | 9239 Garrison Ct.<br>Green Oak, MI 48178 | $352,000.00 |
| m. | Mitchell Tomcsik Jr. | 9/30/05 | 6234 Orchard Wood Dr.<br>W. Bloomfield, MI 48324 | $460,000.00 |
| n. | Mitchell Tomcsik Jr. | 10/10/05 | 8785 Bayview Ct.<br>Pinckney, MI 48169 | $417,600.00 |
| o. | Suzanne Nicholas | 11/8/05 | 3862 Sleepy Fox Dr.<br>Rochester Hills, MI 48309 | $388,000.00 |
| p. | David Lara | 11/18/05 | 9700 Susin Lane<br>Clarkston, MI 48348 | $400,000.00 |
| q. | Paul Whiteside | 11/21/05 | 8674 Oakside Ave.<br>Commerce TWP, MI 48382 | $400,000.00 |
| r. | Paul Whiteside | 11/21/05 | 8271 Cooley Beach Dr.<br>White Lake, MI 48386 | $497,600.00 |
| s. | David Lara | 12/9/05 | 11272 Maple Shores Dr.<br>Goodrich, MI 48438 | $240,000.00 |
| t. | Suzanne Nicholas | 12/12/05 | 9112 Chambord Dr.<br>Augusta TWP, MI 48197 | $280,000.00 |

| | | | | |
|---|---|---|---|---|
| u. | Kevin Bos | 2/10/06 | 3165 Kendrick St.<br>Keego Harbor, MI 48320 | $417,600.00 |
| v. | Lisa Bos | 3/29/06 | 3500 Union Lake Rd.<br>Commerce TWP, MI 48382 | $424,000.00 |
| w. | Jeff Schuck | 3/29/06 | 8655 Lillian Dr.<br>Washington, MI 48094 | $264,000.00 |
| x. | Lisa Bos | 4/13/06 | 25435 Sullivan Lane<br>Novi, MI 48375 | $335,200.00 |
| y. | Lisa Bos | 4/18/06 | 1368 Chaise Ct.<br>South Lyon, MI 48178 | $318,024.00 |
| z. | Jose Martinez | 4/25/06 | 3856 Sleeth Rd.<br>Commerce, MI 48382 | $456,000.00 |
| aa. | Hugh Bradley James | 4/28/06 | 3891 Fenmore Ave.<br>Waterford, MI 48328 | $316,000.00 |
| bb. | Andrew Auty | 5/2/06 | 957 Lakeside Dr.<br>Brighton, MI 48116 | $579,200.00 |
| cc. | Linda Wahler | 7/11/06 | 6485 Shannon Glen Dr. #25<br>Fenton, MI 48430 | $349,600.00 |
| dd. | John P. Mayer | 10/10/06 | 4590 Valleyview Dr.<br>W. Bloomfield, MI 48323 | $320,000.00 |
| ee. | Kathleen Pounds | 10/18/06 | 1977 Ridge Rd.<br>White Lake, MI 48383 | $433,600.00 |
| ff. | Patrick Lloyd | 10/20/06 | 4400 Timber Lake Tr. #6<br>Highland, MI 48357 | $476,000.00 |
| gg. | Ray Hall | 10/24/06 | 371 Hunters Ridge<br>Brandon TWP, MI 48462 | $369,000.00 |
| hh. | Ray Hall | 10/24/06 | 372 Hunters Ridge<br>Brandon TWP, MI 48462 | $357,750.00 |

| ii. | Larry Rideout | 11/30/06 | 11280 Tyrone Tr.<br>Fenton, MI 48430 | $350,000.00 |
| jj. | Ronald Talaski Jr. | 12/4/06 | 3999 Fenmore Ave.<br>Waterford, MI 48328 | $271,920.00 |
| kk. | Kim Kent | 12/20/06 | 45996 Windridge Lane<br>Canton, MI 48188 | $308,000.00 |
| ll. | John Mayer Jr. | 12/27/06 | 6861 Corrigan Dr.<br>Brighton, MI 48116 | $264,000.00 |
| mm. | April Miller | 12/29/06 | 3338 Cummings Ave.<br>Royal Oak, MI 48073 | $320,000.00 |
| nn. | Kim Marie Kent | 2/14/07 | 3356 Talbert Circle #187<br>Rochester Hills, MI 48307 | $289,300.00 |
| oo. | Daniel Martin Panko | 6/30/05 | 13360 N. Fenton Rd.<br>Fenton, MI 48430 | $304,000.00 |
| pp. | Paul Whiteside | 11/21/05 | 6739 Wellesley Terrace<br>Clarkston, MI 48346 | $468,000.00 |

103.     Based on the investigation to date, in connection with the straw loans funded by Fremont listed in paragraph 101 above, Rodriguez, Sturgeon, Nicole Turcheck, or someone at Duke's direction submitted false and fraudulent loan applications and loan packages to Fremont within a month or two prior to the funding of the loan.  Based on the investigation to date, Rodriguez submitted false and fraudulent loan applications and loan packages to Fremont in connection with the transactions (a), (b), (g), (h), (i), (j), (k), (l), (n), and (q) identified in paragraph 101, Sturgeon submitted false and fraudulent loan applications and loan packages to Fremont in connection with the transactions (d), (e), (f), and (m) identified in paragraph 101, and Nicole Turcheck submitted false and fraudulent loan applications and loan packages to Fremont in connection with the transaction (o) identified in paragraph 101.  Based on the investigation to

29

date, forged warranty deeds were also submitted in connection with some or all of the straw loans

funded by Fremont listed in paragraph 101 above.  Fremont reasonably relied upon the false and

fraudulent documents when it agreed to fund the loans and transfer the loan proceeds.

104.    In connection with the ghost loans funded by Fremont listed in paragraph 102

above, Sweeney, Bazzi, Baker, Shilakes or someone at Duke's direction submitted false and

fraudulent purchase agreements to Fremont within a month or two prior to the funding of the

loan.  Based on the investigation to date, Sweeney submitted false and fraudulent purchase

agreements in connection with the transactions (b), (c), (d), (e), (f), (g), (h), (j), (p), (q), (r), (s),

and (pp) identified in paragraph 102, Bazzi submitted false and fraudulent purchase agreements

in connection with the transaction (k) identified in paragraph 102, Baker submitted false and

fraudulent purchase agreements in connection with the transactions (m), (o), (t), (v), (x), and (z)

identified in paragraph 102, and Shilakes submitted false and fraudulent purchase agreements in

connection with the transactions (y), (gg), and (hh) identified in paragraph 102.  Fremont

reasonably relied upon the false and fraudulent documents when it agreed to fund the loans and

transfer the loan proceeds.

105.    In connection with the ghost loans funded by Fremont listed in paragraph 102

above, Rodriguez, Sturgeon, Bennett, Larsen, or someone at Duke's direction submitted loan

applications and loan packages to Fremont within a month or two prior to the funding of the loan.

Based on the investigation to date, Rodriguez submitted false and fraudulent loan applications

and loan packages to Fremont in connection with the transactions (a), (b), (c), (d), (e), (f), (i), (k),

(l), (m), (r), (v), (x), (y), (z), (oo), and (pp) identified in paragraph 102, Sturgeon submitted false

and fraudulent loan applications and loan packages to Fremont in connection with the

transactions (g), (h), (j), (n), (o), (p), (q), (s), and (t) identified in paragraph 102, Bennett submitted false and fraudulent loan applications and loan packages to Fremont in connection with the transactions (w), (aa), (bb), (dd), (ff), (ii), (jj), and (ll) identified in paragraph 102, and Larsen submitted false and fraudulent loan applications and loan packages to Fremont in connection with the transactions (cc), (ee), (gg), and (hh) identified in paragraph 102. Fremont reasonably relied upon the false and fraudulent documents when it agreed to fund the loans and transfer the loan proceeds.

106.    In connection with the ghost loans funded by Fremont listed in paragraph 102 above, Duke, Richardson, Sturgeon, or someone at Duke's direction submitted counterfeit, false and fraudulent HUD-1 settlement statements, CPLs, warranty deeds, mortgages and/or mortgage loans – many of which also included forged signatures – to Fremont just prior to or at the time of the funding of the loan. Based on the investigation to date, Duke submitted false and fraudulent HUD-1 settlement statements, CPLs, warranty deeds, mortgages and/or mortgage loans in connection with the transactions (a), (b), (c), (d), (g), (m), (o), (p), (q), (r), (t), and (pp) identified in paragraph 102, Richardson submitted false and fraudulent HUD-1 settlement statements, CPLs, warranty deeds, mortgages and/or mortgage loans in connection with the transactions (e), (f), (i), (j), (k), (l), (u), (w), (aa), (bb), (cc), (dd), (ee), (ff), (gg), (hh), (ii), (jj), (kk), (ll), (mm), (nn), and (oo) identified in paragraph 102, and Sturgeon submitted false and fraudulent HUD-1 settlement statements, CPLs, warranty deeds, mortgages and/or mortgage loans in connection with the transaction (s) identified in paragraph 102. Fremont reasonably relied upon the false and fraudulent documents when it agreed to fund the loans and transfer the loan proceeds.

31

107.     In the case of the ghost loans funded by Fremont listed in paragraph 102 above, the warranty deeds, mortgages, and/or mortgage notes were never recorded.  The funds Fremont advanced were transferred by wire to escrow accounts under Duke's control at various financial institutions.  Duke and others converted and misappropriated those funds for their own personal use and enjoyment and to make down payments and monthly payments on other loans in order to continue the scheme without detection.

108.     In the case of each of the straw and ghost loans funded by Fremont listed in paragraphs 101 and 102 above, Duke and others involved in the scheme failed to make payments of principal and interest due and owing and the loans all quickly became delinquent.  Unpaid principal and interest on the fifty-nine (59) loans funded by Fremont is in excess of $20,000,000.00.

**Federal Authorities Uncover the Scheme**

109.     On information and belief, federal authorities discovered Duke's scheme to defraud sometime in 2007 while investigating a separate, unrelated criminal enterprise.  Duke's scheme to defraud would have continued indefinitely had federal authorities not discovered it. Fremont learned of Duke's scheme to defraud in October 2007 when it learned of an FBI criminal investigation of four of the closing agents owned and/or controlled by Duke.

## RICO PREDICATE ACT ALLEGATIONS

### Mail and Wire Fraud

110.    There were in force and effect at all relevant times criminal statutes of the United States involving mail and wire fraud, 18 U.S.C. § 1341 and 18 U.S.C. § 1343.  These statutes currently state in relevant parts as follows:

> Whoever, having devised or intending to devise any scheme or artifice to defraud, or for obtaining money or property by means of false or fraudulent pretenses, representations, or promises. . . for the purpose of executing such scheme or artifice or attempting to do so, places in any post office or authorized depository for mail matter, any matter or thing whatever to be sent or delivered by the Postal Service, or deposits or causes to be deposited any matter or thing whatever to be sent or delivered by any private or commercial interstate carrier, or takes or receives therefrom, any such matter or thing, or knowingly causes to be delivered by mail or such carrier according to the direction thereon. . . any such matter or thing, shall be . . . [punished according to law].
>
> *   *   *
>
> Whoever, having devised or intending to devise any scheme or artifice to defraud, or for obtaining money or property by means of false or fraudulent pretenses, representations, or promises, transmits or causes to be transmitted by means of wire, radio, or television communication in interstate or foreign commerce, any writings, signs, signals, pictures, or sounds for the purpose of executing such scheme or artifice, shall be [punished according to law].

111.    Beginning in 2003, Duke devised and, along with other defendants, implemented a scheme to defraud and to obtain money and property by false and fraudulent representations and promises from Fremont and other mortgage lenders.  The scheme included Duke's acquisition and/or control of closing and/or issuing agents and using those companies in connection with obtaining mortgage loans by false and fraudulent representations and promises.

33

112.   To sustain, advance and prevent detection of the scheme to defraud, Duke and other defendants caused statements to be made in loan applications and loan packages regarding straw buyers, the proposed use of subject properties, and the source of funds to be used for down payments on the subject properties, knowing such statements to be false.

113.   To sustain, advance and prevent detection of the scheme to defraud, Duke and other defendants fabricated purchase agreements for ghost loans representing that a nominal seller intended to convey the subject property to a straw buyer, knowing such representations to be false.

114.   To sustain, advance and prevent detection of the scheme to defraud, Duke and other defendants fabricated warranty deeds in connection with ghost loans purporting to transfer title from a nominal seller to a straw buyer, knowing such warranty deeds to be false.

115.   To sustain, advance and prevent detection of the scheme to defraud, Duke and other defendants fabricated HUD-1 settlement statements in connection with ghost loans to give the appearance that a closing of the purchase transaction had occurred and the property had been conveyed, knowing that such appearance was false.

116.   To sustain, advance and prevent detection of the scheme to defraud, Duke and other defendants established and maintained escrow accounts under Duke's control at, among others, JP Morgan Chase and Great Lakes FSB, for the purpose of receiving mortgage loan proceeds from Fremont and other mortgage lenders and misappropriating and converting them to Duke's control.

117.   To sustain, advance and prevent detection of the scheme to defraud, Duke and other defendants laundered the mortgage loan proceeds obtained from Fremont and other

mortgage lenders through a variety of methods, including but not limited to, investing in

Hardcore Racing and Hardcore Motorsports.

118.    In furtherance or execution of the scheme to defraud, Duke and other defendants

caused to be used, on numerous occasions, the U.S. Postal Service, private or commercial

interstate carriers, and interstate wires and telephone lines, in violation of the federal mail and

wire fraud statutes, 18 U.S.C. §§ 1341 and 1343, including but not limited to the following:

    (a)    mailing and wiring to financial institutions false and fraudulent purchase agreements, loan applications, verifications of deposit, lease agreements, and statements of income;

    (b)    mailing and wiring to financial institutions forged, false, or fraudulent mortgages, mortgage notes and warranty deeds;

    (c)    transferring by wire or causing to be so transferred funds and other assets of Fremont and other mortgage lenders directly and indirectly to banks or other financial accounts within the United States maintained and controlled by, or held in the names of, Duke, his aliases, or entities owned and controlled by him.  By way of example only, such transfers include the following illegal wire transfers of funds from accounts held by Fremont:

| Date | Amount of Wire Transfer | Originating Account | Receiving Account |
|---|---|---|---|
| 6/8/2004 | $388,841.31 | Wells Fargo Bank Acct # 10029481 | University Bank Acct #2685604 |
| 4/8/2005 | $360,878.38 | Wells Fargo Bank Acct # 10029481 | Bank One Michigan Acct #656840444 |
| 4/12/2005 | $354,297.71 | Wells Fargo Bank Acct # 10029481 | Bank One Michigan Acct #656840444 |
| 4/26/2005 | $285,551.65 | Wells Fargo Bank Acct # 10029481 | Bank One Michigan Acct #656840444 |

| | | | |
|---|---|---|---|
| 4/28/2005 | $284,891.59 | Wells Fargo Bank<br>Acct # 10029481 | Bank One Michigan<br>Acct #656840444 |
| 5/12/2005 | $437,487.70 | Wells Fargo Bank<br>Acct # 10029481 | Bank One Michigan<br>Acct #656840444 |
| 5/20/2005 | $281,146.14 | Wells Fargo Bank<br>Acct # 10029481 | Citizens Bank<br>Acct #4527931929 |
| 6/13/2005 | $493,201.94 | Wells Fargo Bank<br>Acct # 10029481 | Great Lakes FSB<br>Acct # 01883415221 |
| 6/30/2005 | $207,455.26 | Wells Fargo Bank<br>Acct # 10029481 | Bank One Michigan<br>Acct # 653330050 |
| 7/22/2005 | $349,572.00 | Wells Fargo Bank<br>Acct # 10029481 | Bank One Michigan<br>Acct # 662124288 |
| 7/28/2005 | $439,014.26 | Wells Fargo Bank<br>Acct # 10029481 | Bank One Michigan<br>Acct # 662124288 |
| 7/28/2005 | $354,240.18 | Wells Fargo Bank<br>Acct # 10029481 | Bank One Michigan<br>Acct # 662124288 |
| 9/30/2005 | $463,538.20 | Wells Fargo Bank<br>Acct # 10029481 | JP Morgan Chase MI<br>Acct # 662124569 |
| 10/10/2005 | $418,811.38 | Wells Fargo Bank<br>Acct # 10029481 | JP Morgan Chase MI<br>Acct # 662124569 |
| 11/8/2005 | $392,816.20 | Wells Fargo Bank<br>Acct # 10029481 | JP Morgan Chase MI<br>Acct # 662124569 |
| 11/18/2005 | $403,325.55 | Wells Fargo Bank<br>Acct # 10029481 | JP Morgan Chase MI<br>Acct # 662124569 |
| 11/21/2005 | $406,083.10 | Wells Fargo Bank<br>Acct # 10029481 | JP Morgan Chase MI<br>Acct # 662124569 |
| 11/21/2005 | $505,402.40 | Wells Fargo Bank<br>Acct # 10029481 | JP Morgan Chase MI<br>Acct # 662124569 |

| 12/9/2005 | $241,241.03 | Wells Fargo Bank<br>Acct # 10029481 | JP Morgan Chase MI<br>Acct # 662124569 |
|---|---|---|---|
| 12/12/2005 | $281,845.50 | Wells Fargo Bank<br>Acct # 10029481 | JP Morgan Chase MI<br>Acct # 662124569 |
| 2/10/2006 | $418,865.58 | Wells Fargo Bank<br>Acct # 10029481 | Nat'l City Midwest<br>Acct # 982280434 |
| 3/29/2006 | $426,875.50 | Wells Fargo Bank<br>Acct # 10029481 | Great Lakes FSB<br>Acct # 1883415221 |
| 3/29/2006 | $265,369.04 | Wells Fargo Bank<br>Acct # 10029481 | JP Morgan Chase MI<br>Acct # 656840444 |
| 4/13/2006 | $336,098.26 | Wells Fargo Bank<br>Acct # 10029481 | Great Lakes FSB<br>Acct # 1883415221 |
| 4/18/2006 | $319,184.99 | Wells Fargo Bank<br>Acct # 10029481 | Great Lakes FSB<br>Acct # 1883415221 |
| 4/25/2006 | $458,804.36 | Wells Fargo Bank<br>Acct # 10029481 | Great Lakes FSB<br>Acct # 1883415221 |
| 4/28/2006 | $314,722.62 | Wells Fargo Bank<br>Acct # 10029481 | JP Morgan Chase MI<br>Acct # 656840444 |
| 5/2/2006 | $578,251.07 | Wells Fargo Bank<br>Acct # 10029481 | JP Morgan Chase MI<br>Acct # 656840444 |
| 7/11/2006 | $350,312.89 | Wells Fargo Bank<br>Acct # 10029481 | JP Morgan Chase MI<br>Acct # 716567946 |
| 10/10/2006 | $317,383.42 | Wells Fargo Bank<br>Acct # 10029481 | JP Morgan Chase MI<br>Acct # 656840444 |
| 10/18/2006 | $439,685.10 | Wells Fargo Bank<br>Acct # 10029481 | JP Morgan Chase MI<br>Acct #716567946 |
| 10/20/2006 | $473,698.06 | Wells Fargo Bank<br>Acct # 10029481 | JP Morgan Chase MI<br>Acct # 656840444 |

| | | | |
|---|---|---|---|
| 10/24/2006 | $370,924.98 | Wells Fargo Bank<br>Acct # 10029481 | JP Morgan Chase MI<br>Acct # 716567946 |
| 10/24/2006 | $359,583.60 | Wells Fargo Bank<br>Acct # 10029481 | JP Morgan Chase MI<br>Acct # 716567946 |
| 11/30/2006 | $343,588.28 | Wells Fargo Bank<br>Acct # 10029481 | JP Morgan Chase MI<br>Acct # 656840444 |
| 12/14/2006 | $269,679.92 | Wells Fargo Bank<br>Acct # 10029481 | JP Morgan Chase MI<br>Acct # 656840444 |
| 12/20/2006 | $312,246.02 | Wells Fargo Bank<br>Acct # 10029481 | JP Morgan Chase MI<br>Acct # 716568472 |
| 12/27/2006 | $265,940.10 | Wells Fargo Bank<br>Acct # 10029481 | JP Morgan Chase MI<br>Acct # 656840444 |
| 12/29/2006 | $325,106.87 | Wells Fargo Bank<br>Acct # 10029481 | JP Morgan Chase MI<br>Acct # 716568472 |
| 2/14/2007 | $292,954.40 | Wells Fargo Bank<br>Acct # 10029481 | JP Morgan Chase MI<br>Acct # 716568472 |
| 1/18/2005 | $300,105.02 | Wells Fargo Bank<br>Acct # 10029481 | Comerica Bank<br>Acct # 1851482800 |
| 1/18/2005 | $393,680.28 | Wells Fargo Bank<br>Acct # 10029481 | Comerica Bank<br>Acct # 1850203009 |
| 6/30/2005 | $306,009.87 | Wells Fargo Bank<br>Acct # 10029481 | Bank One MI<br>Acct #653330050 |
| 10/26/2005 | $158,145.40 | Wells Fargo Bank<br>Acct # 10029481 | Huntington Nat'l<br>Acct # 01661795575 |
| 11/10/2005 | $260,439.71 | Wells Fargo Bank<br>Acct # 10029481 | JP Morgan Chase<br>Acct # 686816398 |
| 11/21/2005 | $475,281.00 | Wells Fargo Bank<br>Acct # 10029481 | JP Morgan Chase MI<br>Acct # 662124569 |

| | | | |
|---|---|---|---|
| 1/28/2005 | $390,040.46 | Wells Fargo Bank<br>Acct # 10029481 | JP Morgan Chase MI<br>Acct # 662124569 |
| 12/12/2005 | $328,797.90 | Wells Fargo Bank<br>Acct # 10029481 | Huntington Nat'l<br>Acct # 01661948995 |
| 2/14/2006 | $337,133.45 | Wells Fargo Bank<br>Acct # 10029481 | Independent Bank E.<br>Acct # 039006700 |
| 7/26/2005 | $281,349.86 | Wells Fargo Bank<br>Acct # 10029481 | Comerica Bank<br>Acct # 2000020939 |
| 4/27/2005 | $345,363.86 | Wells Fargo Bank<br>Acct # 10029481 | Fifth Third Bank<br>Acct # 7911338551 |
| 8/24/2006 | $265,075.22 | Wells Fargo Bank<br>Acct # 10029481 | Bank of Ann Arbor<br>Acct # 0100023423 |
| 8/28/2006 | $271,778.90 | Wells Fargo Bank<br>Acct # 10029481 | Bank of Ann Arbor<br>Acct # 0100023423 |
| 10/23/2006 | $267,044.81 | Wells Fargo Bank<br>Acct # 10029481 | Citizens Bank<br>Acct # 4528205539 |
| 11/14/2005 | $242,858.49 | Wells Fargo Bank<br>Acct # 10029481 | Independent Bank E.<br>Acct # 039006700 |
| 10/25/2006 | $281,256.66 | Wells Fargo Bank<br>Acct # 10029481 | Citizens Bank<br>Acct # 4528205539 |
| 9/8/2006 | $263,032.78 | Wells Fargo Bank<br>Acct # 10029481 | JP Morgan Chase<br>Acct # 697551703 |
| 8/29/2006 | $304,723.83 | Wells Fargo Bank<br>Acct # 10029481 | Republic Bank<br>Acct # 3128011081 |
| 12/6/2004 | $ 89,815.56 | Wells Fargo Bank<br>Acct # 10029481 | Comerica Bank<br>Acct # 1851594046 |

**Money Laundering**

119.    There were in force and effect at all relevant times criminal statutes of the United States invoving money laundering, 18 U.S.C. §§ 1956(a)(1) and (2).  These statutes currently state in relevant part as follows:

> Whoever, knowing that the property involved in a financial transaction represents the proceeds of some form of unlawful activity, conducts or attempts to conduct such a financial transaction which in fact involves the proceeds of such unlawful activity – . . . knowing that the transaction is designed in whole or in part – . . . to conceal or disguise the nature, the location, the source, the ownership, or the control of the proceeds of specified unlawful activity. . . shall be [punished according to law].

*   *   *

> Whoever transports, transmits, or transfers, or attempts to transport, transmit, or transfer a monetary instrument or funds from a place in the United States to or through a place outside the United States or to a place in the United States from or through a place outside the United States — . . . knowing that the monetary instrument or funds involved in the transportation, transmission, or transfer represent the proceeds of some form of unlawful activity and knowing that such transportation, transmission, or transfer is designed in whole or in part — to conceal or disguise the nature, the location, the source, the ownership, or the control of the proceeds of specified unlawful activity. . . shall be [punished according to law].

120.    Beginning in 2003, Duke and other defendants conducted or attempted to conduct financial transactions which they knew, or deliberately and consciously avoided confirming, involved funds that were the proceeds of some form of unlawful activity, and were designed to conceal or disguise the nature, location, ownership, or control of the funds, in violation of 18 U.S.C. § 1956(a)(1).  These transactions included, but were not limited to, the following:

(a)     transactions identified in paragraph 118(c) above that included wire transfers to the receiving accounts held in the names of Duke-related entities at the financial institutions designated;

(b)     transactions that included wire transfers from the receiving accounts identified in paragraph 118(c) above held in the names of Duke-related entities; and

(c)     investment of proceeds illegally obtained through the scheme to defraud in Hardcore Racing and Hardcore Motorsports.

## COUNT I

**CLAIMS AGAINST DEFENDANTS DUKE,  ZUNDEL, WELLS,
RICHARDSON, PETERS, STURGEON, AMERICAN NATIONWIDE,
Aapex, CBB, FIRST ESCROW, HARDCORE MOTORSPORTS,
HARDCORE RACING, JS REALTY, LAWYERS ESCROW,
LIBERTY TITLE, MOTORCITY, NATIONS TITLE, NORTH
AMERICAN HOME, OWNER REALTY, PREMIER,
QUOTEMEARATE, REAL ESTATE ONE, SPECIALTY HOLDINGS,
AUTY, BAKER, BASTIEN, BAZZI, ALI BAYDOUN, JAY BAYDOUN,
BENNETT, BEVENSEE, KEVIN BOS, LISA BOS, BRIERLEY, DEES,
FRANK GENDERNALIK, SUSAN GENDERNALIK,
HALL, JAMES, KENT, LARA, LARSEN, LEY, LLOYD, MARTINEZ,
MAYER, MCCUTCHEON, MILLER, COLLETTE MILLITELLO,
JOSEPH MILLITELLO, MORRIS, MOSS, MURPHY,
NAPPER, NICHOLAS, PANKO, POUNDS, RIDEOUT, RODRIGUEZ,
SCHAFER, SCHUCK, SEMAN, SHILAKES, SWEENEY,
TALASKI, TOMCSIK, NICOLE TURCHECK, ROBERT TURCHECK,
<u>WAHLER, WALBROOK, WHITESIDE, YALKIN, AND ZREIK</u>**

### <u>Violations of 18 U.S.C. § 1962(c)</u>

**Fremont v. Defendants Duke, Zundel, Wells,
Richardson, Peters, Sturgeon, American Nationwide,
Aapex, CBB, First Escrow, Lawyers Escrow, Liberty Title,
MotorCity, Nations Title, North American Home, Owner Realty,
Premier, Quotemearate, Real Estate One,
Auty, Baker, Bastien, Bazzi, Ali Baydoun, Jay Baydoun,
Bennett, Bevensee, Kevin Bos, Lisa Bos, Brierley, Dees,
Frank Gendernalik, Susan Gendernalik,
Hall, James, Kent, Lara, Larsen, Ley, Lloyd, Martinez,
Mayer, McCutcheon, Miller, Collette Millitello,
Joseph Millitello, Morris, Moss, Murphy,
Napper, Nicholas, Panko, Pounds, Rideout, Rodriguez,
Schafer, Schuck, Seman, Shilakes, Sweeney,
Talaksi, Tomcsik, Nicole Turcheck, Robert Turcheck,
<u>Wahler, Walbrook, Whiteside, Yalkin, and Zreik</u>**

121.     Plaintiffs reallege paragraphs 1 through 120 above as if set forth verbatim herein.

122.     At all relevant times, Specialty Holdings constituted an enterprise, as that term is

defined in 18 U.S.C. § 1961(4), that engaged in and the affairs of which affected interstate

42

commerce.  In addition, Duke, Zundel, Wells, Richardson, Peters, Sturgeon, First Escrow, Lawyers Escrow, Liberty Title, MotorCity, Nations Title, Auty, Baker, Bastien, Bazzi, Ali Baydoun, Jay Baydoun, Bennett, Bevensee, Kevin Bos, Lisa Bos, Brierley, Dees, Frank Gendernalik, Susan Gendernalik, Hall, James, Kent, Lara, Larsen, Ley, Lloyd, Martinez, Mayer, McCutcheon, Miller, Collette Millitello, Joseph Millitello, Morris, Moss, Murphy, Napper, Nicholas, Panko, Pounds, Rideout, Rodriguez, Schafer, Schuck, Seman, Shilakes, Sweeney, Talaski, Tomcsik, Nicole Turcheck, Robert Turcheck, Wahler, Walbrook, Whiteside, Yalkin and Zreik constituted an association-in-fact enterprise (the "Association").  From at least 2004 until 2007, the Association functioned as a continuing unit with a common purpose that was engaged in and the affairs of which affected interstate commerce.

123.    Duke is a person as that term is defined in 18 U.S.C. § 1961(3) and was, at all relevant times, associated with Specialty Holdings and was a member of the Association. Through his association and membership, Duke was associated with the enterprises.

124.    Zundel is a person as that term is defined in 18 U.S.C. § 1961(3) and was, at all relevant times, associated with Specialty Holdings and Duke and was a member of the Association.  Through his association and membership, Zundel was associated with the enterprises.

125.    Wells is a person as that term is defined in 18 U.S.C. § 1961(3) and was, at all relevant times, associated with Specialty Holdings and Duke and was a member of the Association.  Through his association and membership, Wells was associated with the enterprises.

126.    Richardson is a person as that term is defined in 18 U.S.C. § 1961(3) and was, at all relevant times, associated with Specialty Holdings and Duke and was a member of the Association.  Through her association and membership, Richardson was associated with the enterprises.

127.    Peters is a person as that term is defined in 18 U.S.C. § 1961(3) and was, at all relevant times, associated with Specialty Holdings and Duke and was a member of the Association.  Through his association and membership, Peters was associated with the enterprises.

128.    Sturgeon is a person as that term is defined in 18 U.S.C. § 1961(3) and was, at all relevant times, associated with Specialty Holdings and Duke and was a member of the Association.  Through his association and membership, Sturgeon was associated with the enterprises.

129.    Aapex is a person as that term is defined in 18 U.S.C. § 1961(3) and was, at all relevant times, through its agent Nicole Turcheck, associated with Specialty Holdings, Duke and the Association.  Through its association, Aapex was associated with the enterprises.

130.    American Nationwide is a person as that term is defined in 18 U.S.C. § 1961(3) and was, at all relevant times, through its agent Larsen, associated with Specialty Holdings, Duke and the Association.  Through its association, American Nationwide was associated with the enterprises.

131.    CBB is a person as that term is defined in 18 U.S.C. § 1961(3) and was, at all relevant times, through its agents Rodriguez and Sturgeon, associated with Specialty Holdings, Duke and the Association.  Through its association, CBB was associated with the enterprises.

44

132.    First Escrow is a person as that term is defined in 18 U.S.C. § 1961(3) and was, at all relevant times, associated with Specialty Holdings and Duke and was a member of the Association. Through its association and membership, First Escrow was associated with the enterprises.

133.    Lawyers Escrow is a person as that term is defined in 18 U.S.C. § 1961(3) and was, at all relevant times, associated with Specialty Holdings and Duke and was a member of the Association. Through its association and membership, Lawyers Escrow was associated with the enterprises.

134.    Liberty Title is a person as that term is defined in 18 U.S.C. § 1961(3) and was, at all relevant times, associated with Specialty Holdings and Duke and was a member of the Association. Through its association and membership, Liberty Title was associated with the enterprises.

135.    MotorCity is a person as that term is defined in 18 U.S.C. § 1961(3) and was, at all relevant times, associated with Specialty Holdings and Duke and was a member of the Association. Through its association and membership, MotorCity was associated with the enterprises.

136.    Nations Title is a person as that term is defined in 18 U.S.C. § 1961(3) and was, at all relevant times, associated with Specialty Holdings and Duke and was a member of the Association. Through its association and membership, Nations Title was associated with the enterprises.

137.    North American is a person as that term is defined in 18 U.S.C. § 1961(3) and was, at all relevant times, through its agent Bennett, associated with Specialty Holdings, Duke

and the Association.  Through its association, North American was associated with the enterprises.

138.    Owner Realty is a person as that term is defined in 18 U.S.C. § 1961(3) and was, at all relevant times, through its owner Baker and agent Shilakes, associated with Specialty Holdings, Duke and the Association.  Through its association, Owner Realty was associated with the enterprises.

139.    Premier is a person as that term is defined in 18 U.S.C. § 1961(3) and was, at all relevant times, through its agents Bennett and Sturgeon, associated with Specialty Holdings, Duke and the Association.  Through its association, Premier was associated with the enterprises.

140.    Quotemearate is a person as that term is defined in 18 U.S.C. § 1961(3) and was, at all relevant times, through its agent Sturgeon, associated with Specialty Holdings, Duke and the Association.  Through its association, Quotemearate was associated with the enterprises.

141.    Real Estate One is a person as that term is defined in 18 U.S.C. § 1961(3) and was, at all relevant times, through its agents Bazzi and Sweeney, associated with Specialty Holdings, Duke and the Association.  Through its association, Real Estate One was associated with the enterprises.

142.    Auty is a person as that term is defined in 18 U.S.C. § 1961(3) and was, at all relevant times, associated with Specialty Holdings and Duke and was a member of the Association.  Through his association and membership, Auty was associated with the enterprises.

143.    Baker is a person as that term is defined in 18 U.S.C. § 1961(3) and was, at all relevant times, associated with Specialty Holdings and Duke and was a member of the

Association.  Through his association and membership, Baker was associated with the enterprises.

144.    Bastien is a person as that term is defined in 18 U.S.C. § 1961(3) and was, at all relevant times, associated with Specialty Holdings and Duke and was a member of the Association.  Through her association and membership, Bastien was associated with the enterprises.

145.    Bazzi is a person as that term is defined in 18 U.S.C. § 1961(3) and was, at all relevant times, associated with Specialty Holdings and Duke and was a member of the Association.  Through his association and membership, Bazzi was associated with the enterprises.

146.    Ali Baydoun is a person as that term is defined in 18 U.S.C. § 1961(3) and was, at all relevant times, associated with Specialty Holdings and Duke and was a member of the Association.  Through his association and membership, Ali Baydoun was associated with the enterprises.

147.    Jay Baydoun is a person as that term is defined in 18 U.S.C. § 1961(3) and was, at all relevant times, associated with Specialty Holdings and Duke and was a member of the Association.  Through his association and membership, Jay Baydoun was associated with the enterprises.

148.    Bennett is a person as that term is defined in 18 U.S.C. § 1961(3) and was, at all relevant times, associated with Specialty Holdings and Duke and was a member of the Association.  Through her association and membership, Bennett was associated with the enterprises.

149.   Bevensee is a person as that term is defined in 18 U.S.C. § 1961(3) and was, at all relevant times, associated with Specialty Holdings and Duke and was a member of the Association.  Through his association and membership, Bevensee was associated with the enterprises.

150.   Kevin Bos is a person as that term is defined in 18 U.S.C. § 1961(3) and was, at all relevant times, associated with Specialty Holdings and Duke and was a member of the Association.  Through his association and membership, Kevin Bos was associated with the enterprises.

151.   Lisa Bos is a person as that term is defined in 18 U.S.C. § 1961(3) and was, at all relevant times, associated with Specialty Holdings and Duke and was a member of the Association.  Through his association and membership, Lisa Bos was associated with the enterprises.

152.   Brierley is a person as that term is defined in 18 U.S.C. § 1961(3) and was, at all relevant times, associated with Specialty Holdings and Duke and was a member of the Association.  Through his association and membership, Brierley was associated with the enterprises.

153.   Dees is a person as that term is defined in 18 U.S.C. § 1961(3) and was, at all relevant times, associated with Specialty Holdings and Duke and was a member of the Association.  Through his association and membership, Dees was associated with the enterprises.

154.   Frank Gendernalik is a person as that term is defined in 18 U.S.C. § 1961(3) and was, at all relevant times, associated with Specialty Holdings and Duke and was a member of the

Association. Through his association and membership, Frank Gendernalik was associated with the enterprises.

155. Susan Gendernalik is a person as that term is defined in 18 U.S.C. § 1961(3) and was, at all relevant times, associated with Specialty Holdings and Duke and was a member of the Association. Through her association and membership, Susan Gendernalik was associated with the enterprises.

156. Hall is a person as that term is defined in 18 U.S.C. § 1961(3) and was, at all relevant times, associated with Specialty Holdings and Duke and was a member of the Association. Through his association and membership, Hall was associated with the enterprises.

157. James is a person as that term is defined in 18 U.S.C. § 1961(3) and was, at all relevant times, associated with Specialty Holdings and Duke and was a member of the Association. Through his association and membership, James was associated with the enterprises.

158. Kent is a person as that term is defined in 18 U.S.C. § 1961(3) and was, at all relevant times, associated with Specialty Holdings and Duke and was a member of the Association. Through her association and membership, Kent was associated with the enterprises.

159. Lara is a person as that term is defined in 18 U.S.C. § 1961(3) and was, at all relevant times, associated with Specialty Holdings and Duke and was a member of the Association. Through his association and membership, Lara was associated with the enterprises.

160. Larsen is a person as that term is defined in 18 U.S.C. § 1961(3) and was, at all relevant times, associated with Specialty Holdings and Duke and was a member of the

Association.  Through his association and membership, Larsen was associated with the enterprises.

161.    Ley is a person as that term is defined in 18 U.S.C. § 1961(3) and was, at all relevant times, associated with Specialty Holdings and Duke and was a member of the Association.  Through his association and membership, Ley was associated with the enterprises.

162.    Lloyd is a person as that term is defined in 18 U.S.C. § 1961(3) and was, at all relevant times, associated with Specialty Holdings and Duke and was a member of the Association.  Through his association and membership, Lloyd was associated with the enterprises.

163.    Martinez is a person as that term is defined in 18 U.S.C. § 1961(3) and was, at all relevant times, associated with Specialty Holdings and Duke and was a member of the Association.  Through his association and membership, Martinez was associated with the enterprises.

164.    Mayer is a person as that term is defined in 18 U.S.C. § 1961(3) and was, at all relevant times, associated with Specialty Holdings and Duke and was a member of the Association.  Through his association and membership, Mayer was associated with the enterprises.

165.    McCutcheon is a person as that term is defined in 18 U.S.C. § 1961(3) and was, at all relevant times, associated with Specialty Holdings and Duke and was a member of the Association.  Through her association and membership, McCutcheon was associated with the enterprises.

166.    Miller is a person as that term is defined in 18 U.S.C. § 1961(3) and was, at all relevant times, associated with Specialty Holdings and Duke and was a member of the Association.  Through her association and membership, Miller was associated with the enterprises.

167.    Collette Millitello is a person as that term is defined in 18 U.S.C. § 1961(3) and was, at all relevant times, associated with Specialty Holdings and Duke and was a member of the Association.  Through her association and membership, Collette Millitello was associated with the enterprises.

168.    Joseph Millitello is a person as that term is defined in 18 U.S.C. § 1961(3) and was, at all relevant times, associated with Specialty Holdings and Duke and was a member of the Association.  Through his association and membership, Joseph Millitello was associated with the enterprises.

169.    Morris is a person as that term is defined in 18 U.S.C. § 1961(3) and was, at all relevant times, associated with Specialty Holdings and Duke and was a member of the Association.  Through his association and membership, Morris was associated with the enterprises.

170.    Moss is a person as that term is defined in 18 U.S.C. § 1961(3) and was, at all relevant times, associated with Specialty Holdings and Duke and was a member of the Association.  Through his association and membership, Moss was associated with the enterprises.

171.    Murphy is a person as that term is defined in 18 U.S.C. § 1961(3) and was, at all relevant times, associated with Specialty Holdings and Duke and was a member of the

Association.  Through his association and membership, Murphy was associated with the enterprises.

172.    Napper is a person as that term is defined in 18 U.S.C. § 1961(3) and was, at all relevant times, associated with Specialty Holdings and Duke and was a member of the Association.  Through her association and membership, Napper was associated with the enterprises.

173.    Nicholas is a person as that term is defined in 18 U.S.C. § 1961(3) and was, at all relevant times, associated with Specialty Holdings and Duke and was a member of the Association.  Through her association and membership, Nicholas was associated with the enterprises.

174.    Panko is a person as that term is defined in 18 U.S.C. § 1961(3) and was, at all relevant times, associated with Specialty Holdings and Duke and was a member of the Association.  Through his association and membership, Panko was associated with the enterprises.

175.    Pounds is a person as that term is defined in 18 U.S.C. § 1961(3) and was, at all relevant times, associated with Specialty Holdings and Duke and was a member of the Association.  Through her association and membership, Pounds was associated with the enterprises.

176.    Rideout is a person as that term is defined in 18 U.S.C. § 1961(3) and was, at all relevant times, associated with Specialty Holdings and Duke and was a member of the Association.  Through his association and membership, Rideout was associated with the enterprises.

177.    Rodriguez is a person as that term is defined in 18 U.S.C. § 1961(3) and was, at all relevant times, associated with Specialty Holdings and Duke and was a member of the Association.  Through his association and membership, Rodriguez was associated with the enterprises.

178.    Schafer is a person as that term is defined in 18 U.S.C. § 1961(3) and was, at all relevant times, associated with Specialty Holdings and Duke and was a member of the Association.  Through his association and membership, Schafer was associated with the enterprises.

179.    Schuck is a person as that term is defined in 18 U.S.C. § 1961(3) and was, at all relevant times, associated with Specialty Holdings and Duke and was a member of the Association.  Through his association and membership, Schuck was associated with the enterprises.

180.    Seman is a person as that term is defined in 18 U.S.C. § 1961(3) and was, at all relevant times, associated with Specialty Holdings and Duke and was a member of the Association.  Through her association and membership, Seman was associated with the enterprises.

181.    Shilakes is a person as that term is defined in 18 U.S.C. § 1961(3) and was, at all relevant times, associated with Specialty Holdings and Duke and was a member of the Association.  Through his association and membership, Shilakes was associated with the enterprises.

182.    Sweeney is a person as that term is defined in 18 U.S.C. § 1961(3) and was, at all relevant times, associated with Specialty Holdings and Duke and was a member of the

Association. Through her association and membership, Sweeney was associated with the enterprises.

183.    Talaski is a person as that term is defined in 18 U.S.C. § 1961(3) and was, at all relevant times, associated with Specialty Holdings and Duke and was a member of the Association. Through his association and membership, Talaski was associated with the enterprises.

184.    Tomcsik is a person as that term is defined in 18 U.S.C. § 1961(3) and was, at all relevant times, associated with Specialty Holdings and Duke and was a member of the Association. Through his association and membership, Tomcsik was associated with the enterprises.

185.    Nicole Turcheck is a person as that term is defined in 18 U.S.C. § 1961(3) and was, at all relevant times, associated with Specialty Holdings and Duke and was a member of the Association. Through her association and membership, Nicole Turcheck was associated with the enterprises.

186.    Robert Turcheck is a person as that term is defined in 18 U.S.C. § 1961(3) and was, at all relevant times, associated with Specialty Holdings and Duke and was a member of the Association. Through his association and membership, Robert Turcheck was associated with the enterprises.

187.    Wahler is a person as that term is defined in 18 U.S.C. § 1961(3) and was, at all relevant times, associated with Specialty Holdings and Duke and was a member of the Association. Through her association and membership, Wahler was associated with the enterprises.

188.    Walbrook is a person as that term is defined in 18 U.S.C. § 1961(3) and was, at all relevant times, associated with Specialty Holdings and Duke and was a member of the Association.  Through her association and membership, Walbrook was associated with the enterprises.

189.    Whiteside is a person as that term is defined in 18 U.S.C. § 1961(3) and was, at all relevant times, associated with Specialty Holdings and Duke and was a member of the Association.  Through his association and membership, Whiteside was associated with the enterprises.

190.    Yalkin is a person as that term is defined in 18 U.S.C. § 1961(3) and was, at all relevant times, associated with Specialty Holdings and Duke and was a member of the Association.  Through his association and membership, Yalkin was associated with the enterprises.

191.    Zreik is a person as that term is defined in 18 U.S.C. § 1961(3) and was, at all relevant times, associated with Specialty Holdings and Duke and was a member of the Association.  Through his association and membership, Zreik was associated with the enterprises.

192.    From time to time from 2004 through sometime in 2007, Duke, Zundel, Wells, Richardson, Peters, Sturgeon, First Escrow, Lawyers Escrow, Liberty Title, MotorCity, Nations Title, Auty, Baker, Bastien, Bazzi, Ali Baydoun, Jay Baydoun, Bennett, Bevensee, Kevin Bos, Lisa Bos, Brierley, Dees, Frank Gendernalik, Susan Gendernalik, Hall, James, Kent, Lara, Larsen, Ley, Lloyd, Martinez, Mayer, McCutcheon, Miller, Collette Millitello, Joseph Millitello, Morris, Moss, Murphy, Napper, Nicholas, Panko, Pounds, Rideout, Rodriguez, Schafer, Schuck,

Seman, Shilakes, Sweeney, Talaski, Tomcsik, Nicole Turcheck, Robert Turcheck, Wahler, Walbrook, Whiteside, Yalkin, and Zreik, and Aapex, American Nationwide, CBB, North Amercan Home, Owner Realty, Premier, Quotemearate, and Real Estate One, through their agents, knowingly conducted, participated in, controlled, manipulated, or directed one or more of the enterprises' affairs through a pattern of racketeering activity consisting of violations of the federal mail and wire fraud statutes, and the federal money laundering statutes, in violation of 18 U.S.C. § 1962(c).

193.   Specifically, Duke, Zundel, Wells, Richardson, Peters, Sturgeon, First Escrow, Lawyers Escrow, Liberty Title, MotorCity, Nations Title, Auty, Baker, Bastien, Bazzi, Ali Baydoun, Jay Baydoun, Bennett, Bevensee, Kevin Bos, Lisa Bos, Brierley, Dees, Frank Gendernalik, Susan Gendernalik, Hall, James, Kent, Lara, Larsen, Ley, Lloyd, Martinez, Mayer, McCutcheon, Miller, Collette Millitello, Joseph Millitello, Morris, Moss, Murphy, Napper, Nicholas, Panko, Pounds, Rideout, Rodriguez, Schafer, Schuck, Seman, Shilakes, Sweeney, Talaski, Tomcsik, Nicole Turcheck, Robert Turcheck, Wahler, Walbrook, Whiteside, Yalkin, and Zreik, and Aapex, American Nationwide, CBB, North Amercan Home, Owner Realty, Premier, Quotemearate, and Real Estate One, through their agents, assisted, facilitated and implemented the scheme to defraud as follows:

a.   Duke located homes to be purchased through straw loans in the names of straw buyers, recruited persons to act as straw buyers for properties in both straw and ghost loan transactions, fabricated documents in connection with both straw and ghost loan transactions, submitted loan applications and loan packages to mortgage lenders and communicated with mortgage lenders, and closed straw loan transactions and documented ghost loan

transactions to give the appearance that ghost loans were actually being closed.

b.    Zundel submitted loan applications and loan packages to mortgage lenders and communicated with mortgage lenders.

c.    Wells closed straw loan transactions and documented ghost loan transactions to give the appearance that the ghost loans were actually being closed.

d.    Richardson closed straw loan transactions and documented ghost loan transactions to give the appearance that the ghost loans were actually being closed.

e.    Peters closed straw loan transactions and documented ghost loan transactions to give the appearance that the ghost loans were actually being closed.

f.    Sturgeon submitted loan applications and loan packages to mortgage lenders and communicated with mortgage lenders.

g.    Aapex, through its agent Nicole Turcheck, submitted loan applications and loan packages to mortgage lenders and communicated with mortgage lenders.

h.    American Nationwide, through its agent Larsen, submitted loan applications and loan packages to mortgage lenders and communicated with mortgage lenders.

i.    CBB, through its agents Rodriguez and Sturgeon, submitted loan applications and loan packages to mortgage lenders and communicated with mortgage lenders.

j.    First Escrow closed straw loan transactions and documented ghost loan transactions to give the

appearance that the ghost loans were actually being closed.

k.     Lawyers Escrow closed straw loan transactions and documented ghost loan transactions to give the appearance that the ghost loans were actually being closed.

l.     Liberty Title closed straw loan transactions and documented ghost loan transactions to give the appearance that the ghost loans were actually being closed.

m.     MotorCity closed straw loan transactions and documented ghost loan transactions to give the appearance that the ghost loans were actually being closed.

n.     Nations Title closed straw loan transactions and documented ghost loan transactions to give the appearance that the ghost loans were actually being closed.

o.     North American, through its agent Bennett, submitted loan applications and loan packages to mortgage lenders and communicated with mortgage lenders.

p.     Owner Realty, through its owner Baker and agent Shilakes, located homes to be purchased through straw loans in the names of straw buyers and fabricated purchase agreements for ghost loans.

q.     Premier, through its agents Bennett and Sturgeon, submitted loan applications and loan packages to mortgage lenders and communicated with mortgage lenders.

r.     Quotemearate, through its agent Sturgeon, submitted loan applications and loan packages to mortgage lenders and communicated with mortgage lenders.

s.    Real Estate One, through its agents Bazzi and Sweeney, located homes to be purchased through straw loans in the names of straw buyers and fabricated purchase agreements for ghost loans.

t.    Auty posed as a borrower on one or more ghost loan transactions.

u.    Baker prepared fraudulent property appraisals and fabricated purchase agreements for ghost loans.

v.    Bastien completed loan applications on behalf of straw buyers, collected and organized documents and information for inclusion in loan packages and participated in the submission of loan packages to mortgage lenders and communicated with mortgage lenders.

w.    Bazzi located homes to be purchased through straw loans in the names of straw buyers and fabricated purchase agreements for ghost loans.

x.    Ali Baydoun completed loan applications on behalf of straw buyers, collected and organized documents and information for inclusion in loan packages and participated in the submission of loan packages to mortgage lenders and communicated with mortgage lenders.

y.    Jay Baydoun closed straw loan transactions and documented ghost loan transactions to give the appearance that the ghost loans were actually being closed and recruited persons to act as straw buyers for properties in both straw and ghost loan transactions.

z.    Bennett submitted loan applications and loan packages to mortgage lenders and communicated with mortgage lenders.

aa.    Bevensee posed as a borrower on one or more straw or ghost loan transactions.

bb.   Kevin Bos posed as a borrower on one or more ghost loan transactions.

cc.   Lisa Bos posed as a borrower on one or more ghost loan transactions.

dd.   Brierley closed straw loan transactions and documented ghost loan transactions to give the appearance that the ghost loans were actually being closed.

ee.   Dees posed as a borrower on one or more ghost loan transactions.

ff.   Frank Gendernalik posed as a borrower on one or more ghost loan transactions.

gg.   Susan Gendernalik posed as a borrower on one or more ghost loan transactions.

hh.   Hall posed as a borrower on one or more ghost loan transactions.

ii.   James posed as a borrower on one or more ghost loan transactions.

jj.   Kent posed as a borrower on one or more ghost loan transactions.

kk.   Lara posed as a borrower on one or more ghost loan transactions.

ll.   Larsen submitted loan applications and loan packages to mortgage lenders and communicated with mortgage lenders.

mm.   Ley posed as a borrower on one or more straw or ghost loan transactions.

nn.   Lloyd posed as a borrower on one or more ghost loan transactions.

oo.   Martinez posed as a borrower on one or more ghost loan transactions.

pp.   Mayer posed as a borrower on one or more ghost loan transactions.

qq.   McCutcheon completed loan applications on behalf of straw buyers, collected and organized documents and information for inclusion in loan packages and participated in the submission of loan packages to mortgage lenders and communicated with mortgage lenders.

rr.   Miller posed as a borrower on one or more ghost loan transactions.

ss.   Collette Millitello posed as a borrower on one or more ghost loan transactions.

tt.   Joseph Millitello posed as a borrower on one or more ghost loan transactions.

uu.   Morris posed as a borrower on one or more ghost loan transactions.

vv.   Moss posed as a borrower on one or more ghost loan transactions.

ww.   Murphy posed as a borrower on one or more ghost loan transactions.

xx.   Napper submitted loan applications and loan packages to mortgage lenders and communicated with mortgage lenders.

yy.   Nicholas posed as a borrower on one or more ghost loan transactions.

zz.   Panko posed as a borrower on one or more ghost loan transactions.

aaa.   Pounds posed as a borrower on one or more ghost loan transactions.

61

bbb.  Rideout posed as a borrower on one or more ghost loan transactions.

ccc.  Rodriguez submitted loan applications and loan packages to mortgage lenders and communicated with mortgage lenders.

ddd.  Schafer acted as a straw buyer and allowed his name to be used on loan applications and other documents knowing he was not the true buyer of the property.

eee.  Schuck posed as a borrower on one or more ghost loan transactions.

fff.  Seman completed loan applications on behalf of straw buyers, collected and organized documents and information for inclusion in loan packages and participated in the submission of loan packages to mortgage lenders and communicated with mortgage lenders.

ggg.  Shilakes located homes to be purchased through straw loans in the names of straw buyers and fabricated purchase agreements for ghost loans.

hhh.  Sweeney located homes to be purchased through straw loans in the names of straw buyers and fabricated purchase agreements for ghost loans.

iii.  Talaski posed as a borrower on one or more ghost loan transactions.

jjj.  Tomcsik posed as a borrower on one or more ghost loan transactions.

kkk.  Nicole Turcheck submitted loan applications and loan packages to mortgage lenders and communicated with mortgage lenders.

lll.  Robert Turcheck located homes to be purchased through straw loans in the names of straw buyers and recruited persons to act as straw buyers for properties in both straw and ghost loan transactions.

mmm.   Wahler posed as a borrower on one or more ghost
loan transactions.

nnn.   Walbrook completed loan applications on behalf of
straw buyers, collected and organized documents
and information for inclusion in loan packages and
participated in the submission of loan packages to
mortgage lenders and communicated with mortgage
lenders.

ooo.   Whiteside posed as a borrower on one or more
ghost loan transactions.

ppp.   Yalkin posed as a borrower on one or more ghost
loan transactions.

qqq.   Zreik prepared fraudulent property appraisals in
ghost loan transactions.

194.   Duke, Zundel, Wells, Richardson, Peters, Sturgeon, First Escrow, Lawyers
Escrow, Liberty Title, MotorCity, Nations Title, Auty, Baker, Bastien, Bazzi, Ali Baydoun, Jay
Baydoun, Bennett, Bevensee, Kevin Bos, Lisa Bos, Brierley, Dees, Frank Gendernalik, Susan
Gendernalik, Hall, James, Kent, Lara, Larsen, Ley, Lloyd, Martinez, Mayer, McCutcheon, Miller,
Collette Millitello, Joseph Millitello, Morris, Moss, Murphy, Napper, Nicholas, Panko, Pounds,
Rideout, Rodriguez, Schafer, Schuck, Seman, Shilakes, Sweeney, Talaski, Tomcsik, Nicole
Turcheck, Robert Turcheck, Wahler, Walbrook, Whiteside, Yalkin, and Zreik, and Aapex,
American Nationwide, CBB, North Amercan Home, Owner Realty, Premier, Quotemearate, and
Real Estate One, through their agents, all received substantial monetary and other benefits
resulting from the scheme to defraud.

195.   Duke, Zundel, Wells, Richardson, Peters, Sturgeon, First Escrow, Lawyers
Escrow, Liberty Title, MotorCity, Nations Title, Auty, Baker, Bastien, Bazzi, Ali Baydoun, Jay

Baydoun, Bennett, Bevensee, Kevin Bos, Lisa Bos, Brierley, Dees, Frank Gendernalik, Susan Gendernalik, Hall, James, Kent, Lara, Larsen, Ley, Lloyd, Martinez, Mayer, McCutcheon, Miller, Collette Millitello, Joseph Millitello, Morris, Moss, Murphy, Napper, Nicholas, Panko, Pounds, Rideout, Rodriguez, Schafer, Schuck, Seman, Shilakes, Sweeney, Talaski, Tomcsik, Nicole Turcheck, Robert Turcheck, Wahler, Walbrook, Whiteside, Yalkin, and Zreik, and Aapex, American Nationwide, CBB, North Amercan Home, Owner Realty, Premier, Quotemearate, and Real Estate One, through their agents, knew that the U.S. Postal Service, private or commercial interstate carriers, and interstate wires and telephone lines would be used in furtherance of Duke's scheme to defraud, as described in paragraph 118 above, in violation of the federal mail and wire fraud statutes, 18 U.S.C. §§ 1341 and 1343.

196.    Duke, Zundel, Wells, Richardson, Peters, Sturgeon and others engaged in money laundering activity by at least the following conduct, including but not limited to:  setting up the accounts at various banks for accepting the wire transfers of mortgage proceeds identified in paragraph 118, directing wire transfers to those accounts, processing wire transfer transactions from those accounts, and investing proceeds illegally obtained through the scheme to defraud in Hardcore Racing and Hardcore Motorsports, all while they knew or deliberately and consciously avoided confirming that the funds involved in the transactions were the proceeds of some form of unlawful activity, in violation of 18 U.S.C. §§ 1956(a)(1) and (2).

197.    The uses of the mails and wires in furtherance of the scheme to defraud and the money laundering activity amounted to continuing criminal activity and thus constituted a pattern of racketeering activity pursuant to 18 U.S.C. § 1961(1)(b)(5), in violation of 18 U.S.C. § 1962(c).

198.   The uses of the mails and wires described in paragraph 118 above in furtherance of the scheme to defraud was the regular way of conducting the ongoing business activities of Duke, Zundel, Wells, Richardson, Peters, Sturgeon, First Escrow, Lawyers Escrow, Liberty Title, MotorCity, Nations Title, Auty, Baker, Bastien, Bazzi, Ali Baydoun, Jay Baydoun, Bennett, Bevensee, Kevin Bos, Lisa Bos, Brierley, Dees, Frank Gendernalik, Susan Gendernalik, Hall, James, Kent, Lara, Larsen, Ley, Lloyd, Martinez, Mayer, McCutcheon, Miller, Collette Millitello, Joseph Millitello, Morris, Moss, Murphy, Napper, Nicholas, Panko, Pounds, Rideout, Rodriguez, Schafer, Schuck, Seman, Shilakes, Sweeney, Talaski, Tomcsik, Nicole Turcheck, Robert Turcheck, Wahler, Walbrook, Whiteside, Yalkin, and Zreik, and Aapex, American Nationwide, CBB, North Amercan Home, Owner Realty, Premier, Quotemearate, and Real Estate One, through their agents, and would have continued indefinitely, had federal authorities not learned of the scheme and taken action to end it.

199.   The money laundering activity described in paragraph 120 above was the regular way of conducting the ongoing business activities of Duke, Zundel, Wells, Richardson, Peters, Sturgeon and other defendants and would have continued indefinitely, had federal authorities not learned of the scheme and taken action to end it.

200.   As a direct result of the scheme to defraud, the use of the mails and wires in furtherance thereof, the money laundering activity, and by reason of the operation of the enterprises through the above-described pattern of racketeering activity, Fremont was injured in its business and property in an amount not yet determined, but believed to be in excess of $20,000,000.

### Violations of 18 U.S.C. § 1962(d)

**Fremont v. Defendants Duke, Zundel, Wells,
Richardson, Peters, Sturgeon, Aapex, American Nationwide,
CBB, First Escrow, Hardcore Motorsports,
Hardcore Racing, JS Realty, Lawyers Escrow, Liberty Title,
MotorCity, Nations Title, North American Home, Owner Realty,
Premier, Quotemearate, Real Estate One,
Auty, Baker, Bastien, Bazzi, Ali Baydoun, Jay Baydoun,
Bennett, Bevensee, Kevin Bos, Lisa Bos, Brierley, Dees,
Frank Gendernalik, Susan Gendernalik,
Hall, James, Kent, Lara, Larsen, Ley, Lloyd, Martinez,
Mayer, McCutcheon, Miller, Collette Millitello,
Joseph Millitello, Morris, Moss, Murphy,
Napper, Nicholas, Panko, Pounds, Rideout, Rodriguez,
Schafer, Schuck, Seman, Shilakes, Sweeney,
Talaksi, Tomcsik, Nicole Turcheck, Robert Turcheck,
Wahler, Walbrook, Whiteside, Yalkin, and Zreik**

201. Plaintiffs reallege paragraphs 1 through 200 above as if set forth verbatim herein.

202. Harcore Racing is a person as that term is defined in 18 U.S.C. § 1961(3).

203. Hardcore Motorsports is a person as that term is defined in 18 U.S.C. § 1961(3).

204. JS Realty is a person as that term is defined in 18 U.S.C. § 1961(3).

205. Duke, Zundel, Wells, Richardson, Peters, Sturgeon, First Escrow, Hardcore Motorsports, Hardcore Racing, JS Realty, Lawyers Escrow, Liberty Title, MotorCity, Nations Title, Auty, Baker, Bastien, Bazzi, Ali Baydoun, Jay Baydoun, Bennett, Bevensee, Kevin Bos, Lisa Bos, Brierley, Dees, Frank Gendernalik, Susan Gendernalik, Hall, James, Kent, Lara, Larsen, Ley, Lloyd, Martinez, Mayer, McCutcheon, Miller, Collette Millitello, Joseph Millitello, Morris, Moss, Murphy, Napper, Nicholas, Panko, Pounds, Rideout, Rodriguez, Schafer, Schuck, Seman, Shilakes, Sweeney, Talaski, Tomcsik, Nicole Turcheck, Robert Turcheck, Wahler, Walbrook, Whiteside, Yalkin, and Zreik, and Aapex, American Nationwide, CBB, North

Amercan Home, Owner Realty, Premier, Quotemearate, and Real Estate One, through their agents, conspired to participate in one or more of the enterprises' affairs through a pattern of racketeering activity, specifically: multiple acts of mail and wire fraud in violation of 18 U.S.C. § 1341 and 18 U.S.C. § 1343, and multiple acts of money laundering in violation of 18 U.S.C. § 1956(a)(1) and (2), in violation of 18 U.S.C. § 1962(c), all in violation of 18 U.S.C. § 1962(d).

206.    Specifically, Duke and other defendants devised and implemented a scheme to defraud Fremont and other mortgage lenders out of tens of millions of dollars.  Zundel, Wells, Richardson, Peters, Sturgeon, First Escrow, Hardcore Motorsports, Hardcore Racing, JS Realty, Lawyers Escrow, Liberty Title, MotorCity, Nations Title, Auty, Baker, Bastien, Bazzi, Ali Baydoun, Jay Baydoun, Bennett, Bevensee, Kevin Bos, Lisa Bos, Brierley, Dees, Frank Gendernalik, Susan Gendernalik, Hall, James, Kent, Lara, Larsen, Ley, Lloyd, Martinez, Mayer, McCutcheon, Miller, Collette Millitello, Joseph Millitello, Morris, Moss, Murphy, Napper, Nicholas, Panko, Pounds, Rideout, Rodriguez, Schafer, Schuck, Seman, Shilakes, Sweeney, Talaski, Tomcsik, Nicole Turcheck, Robert Turcheck, Wahler, Walbrook, Whiteside, Yalkin, and Zreik, and Aapex, American Nationwide, CBB, North Amercan Home, Owner Realty, Premier, Quotemearate, and Real Estate One, through their agents, knew that Duke and others were engaged in a scheme to defraud Fremont and other mortgage lenders out of tens of millions of dollars.

207.    Duke and other defendants agreed to facilitate and did facilitate the scheme to defraud and agreed to facilitate and did facilitate the money laundering activities by the conduct alleged above.

208.    Hardcore Racing, Hardcore Motorsports and JS Realty agreed to facilitate and did facilitate the money laundering activities by accepting as investments mortgage loan proceeds illegally obtained through the scheme to defraud.

209.    Zundel, Wells, Richardson, Peters, Sturgeon, First Escrow, Lawyers Escrow, Liberty Title, MotorCity, Nations Title, Auty, Baker, Bastien, Bazzi, Ali Baydoun, Jay Baydoun, Bennett, Bevensee, Kevin Bos, Lisa Bos, Brierley, Dees, Frank Gendernalik, Susan Gendernalik, Hall, James, Kent, Lara, Larsen, Ley, Lloyd, Martinez, Mayer, McCutcheon, Miller, Collette Millitello, Joseph Millitello, Morris, Moss, Murphy, Napper, Nicholas, Panko, Pounds, Rideout, Rodriguez, Schafer, Schuck, Seman, Shilakes, Sweeney, Talaski, Tomcsik, Nicole Turcheck, Robert Turcheck, Wahler, Walbrook, Whiteside, Yalkin, and Zreik, and Aapex, American Nationwide, CBB, North Amercan Home, Owner Realty, Premier, Quotemearate, and Real Estate One, through their agents, agreed to facilitate Duke's scheme to defraud, and did facilitate Duke's scheme to defraud, and agreed to facilitate and did facilitate Duke's money laundering activities by the conduct alleged above.

210.    By this conduct, Duke, Zundel, Wells, Richardson, Peters, Sturgeon, First Escrow, Hardcore Motorsports, Hardcore Racing, JS Realty, Lawyers Escrow, Liberty Title, MotorCity, Nations Title, Auty, Baker, Bastien, Bazzi, Ali Baydoun, Jay Baydoun, Bennett, Bevensee, Kevin Bos, Lisa Bos, Brierley, Dees, Frank Gendernalik, Susan Gendernalik, Hall, James, Kent, Lara, Larsen, Ley, Lloyd, Martinez, Mayer, McCutcheon, Miller, Collette Millitello, Joseph Millitello, Morris, Moss, Murphy, Napper, Nicholas, Panko, Pounds, Rideout, Rodriguez, Schafer, Schuck, Seman, Shilakes, Sweeney, Talaski, Tomcsik, Nicole Turcheck, Robert Turcheck, Wahler, Walbrook, Whiteside, Yalkin, and Zreik, and Aapex, American Nationwide, CBB, North

Amercan Home, Owner Realty, Premier, Quotemearate, and Real Estate One, through their

agents, agreed to participate in the affairs of the enterprises through a pattern of racketeering

activity.

211.    Fremont was injured in its business and property by reason of the violation of 18

U.S.C. § 1962(d) in an amount not yet determined, but believed to be in excess of $20,000,000.

## Violations of 18 U.S.C. § 1962(a)

### Fremont v. Defendants Duke, Hardcore Racing,
### Hardcore Motorsports, Wells and Richardson

212.    Plaintiff realleges paragraphs 1 through 119 as if set forth verbatim herein.

213.    At all relevant times, Hardcore Racing and Hardcore Motorsports each constituted

an enterprise as that term is defined in 18 U.S.C. § 1961(4).

214.    Hardcore Racing is a person as that term is defined in 18 U.S.C. § 1961(3).

215.    Hardcore Motorsports is a person as that term is defined in 18 U.S.C. § 1961(3).

216.    Duke is a person as that term is defined in 18 U.S.C. § 1961(3) and was, at all

relevant times, associated with Hardcore Racing and Hardcore Motorsports.

217.    Wells is a person as that term is defined in 18 U.S.C. § 1961(3) and was, at all

relevant times, associated with Hardcore Racing and Hardcore Motorsports.

218.    Richardson is a person as that term is defined in 18 U.S.C. § 1961(3) and was, at

all relevant times, associated with Hardcore Racing and Hardcore Motorsports.

219.    The predicate acts of mail and wire fraud and money laundering described in

paragraphs 118 and 120 above constituted a pattern of racketeering activity as defined in 18

U.S.C. § 1961(5).  Duke, Wells, and Richardson used and invested, directly or indirectly,

racketeering income derived from the pattern of racketeering activity to acquire, establish and/or operate Hardcore Racing and Hardcore Motorsports.

220.    Fremont was injured in its business or property by reason of the use or investment of racketeering income in Hardcore Racing and Hardcore Motorsports, in an amount yet to be determined.  The use and investment of such income in the acquisition, establishment, and/or operation of Hardcore Racing and Hardcore Motorsports obscured that income from Fremont and placed it substantially beyond Fremont's reach.

## Common Law Fraud

**Fremont v. Defendants Duke, Zundel, Wells, Richardson, Peters, Sturgeon, First Escrow, Hardcore Motorsports, Hardcore Racing, JS Realty, Lawyers Escrow, Liberty Title, MotorCity, Nations Title, Specialty Holdings, Auty, Baker, Bastien, Bazzi, Ali Baydoun, Jay Baydoun, Bennett, Bevensee, Kevin Bos, Lisa Bos, Brierley, Dees, Frank Gendernalik, Susan Gendernalik, Hall, James, Kent, Lara, Larsen, Ley, Lloyd, Martinez, Mayer, McCutcheon, Miller, Collette Millitello, Joseph Millitello, Morris, Moss, Murphy, Napper, Nicholas, Panko, Pounds, Rideout, Rodriguez, Schafer, Schuck, Seman, Shilakes,Sweeney, Talaksi, Tomcsik, Nicole Turcheck, Robert Turcheck, <u>Wahler, Walbrook, Whiteside, Yalkin, and Zreik</u>**

221.    Plaintiffs reallege paragraphs 1 through 220 above as if set forth verbatim herein.

222.    Duke devised and implemented the scheme to defraud by acquiring and gaining control over mortgage loan proceeds while concealing the true nature of the loan transactions, participating in the laundering of the mortgage loan proceeds illegally obtained, engaging in both straw and ghost loan transactions, and making misrepresentations concerning the conduct of himself and others, upon which Fremont reasonably relied, for the benefit of himself and others.

70

Zundel, Wells, Richardson, Peters, Sturgeon, First Escrow, Hardcore Motorsports, Hardcore Racing, JS Realty, Lawyers Escrow, Liberty Title, MotorCity, Nations Title, Specialty Holdings, Auty, Baker, Bastien, Bazzi, Ali Baydoun, Jay Baydoun, Bennett, Bevensee, Kevin Bos, Lisa Bos, Brierley, Dees, Frank Gendernalik, Susan Gendernalik, Hall, James, Kent, Lara, Larsen, Ley, Lloyd, Martinez, Mayer, McCutcheon, Miller, Collette Millitello, Joseph Millitello, Morris, Moss, Murphy, Napper, Nicholas, Panko, Pounds, Rideout, Rodriguez, Schafer, Schuck, Seman, Shilakes, Sweeney, Talaski, Tomcsik, Nicole Turcheck, Robert Turcheck, Wahler, Walbrook, Whiteside, Yalkin, and Zreik implemented Duke's scheme to defraud by knowingly assisting in acquiring and gaining control over mortgage loan proceeds while concealing the true nature of the loan transactions, participating in the laundering of the mortgage loan proceeds illegally obtained, engaging in both straw and ghost loan transactions, and making misrepresentations concerning the conduct of themselves and others, upon which Fremont reasonably relied, for the benefit of Duke, themselves and others.

223.    As a direct and proximate result of these Defendants' frauds, Fremont was damaged in an amount not yet determined, but believed to be in excess of $20,000,000.

**Civil Conspiracy**

**Fremont v. Defendants Duke, Zundel, Wells,
Richardson, Peters, Sturgeon, Aapex, American Nationwide,
CBB, First Escrow, Hardcore Motorsports,
Hardcore Racing, JS Realty, Lawyers Escrow, Liberty Title,
MotorCity, Nations Title, North American Home, Owner Realty,
Premier, Quotemearate, Real Estate One, Specialty Holdings,
Auty, Baker, Bastien, Bazzi, Ali Baydoun, Jay Baydoun,
Bennett, Bevensee, Kevin Bos, Lisa Bos, Brierley, Dees,
Frank Gendernalik, Susan Gendernalik,
Hall, James, Kent, Lara, Larsen, Ley, Lloyd, Martinez,
Mayer, McCutcheon, Miller, Collette Millitello,
Joseph Millitello, Morris, Moss, Murphy,
Napper, Nicholas, Panko, Pounds, Rideout, Rodriguez,
Schafer, Schuck, Seman, Shilakes, Sweeney,
Talaksi, Tomcsik, Nicole Turcheck, Robert Turcheck,
Wahler, Walbrook, Whiteside, Yalkin, and Zreik**

224.    Plaintiff realleges paragraphs 1 through 223 above as if set forth verbatim herein.

225.    By their conduct alleged above, Duke, Zundel, Wells, Richardson, Peters,

Sturgeon, First Escrow, Hardcore Motorsports, Hardcore Racing, JS Realty, Lawyers Escrow,

Liberty Title, MotorCity, Nations Title, Specialty Holdings, Auty, Baker, Bastien, Bazzi, Ali

Baydoun, Jay Baydoun, Bennett, Bevensee, Kevin Bos, Lisa Bos, Brierley, Dees, Frank

Gendernalik, Susan Gendernalik, Hall, James, Kent, Lara, Larsen, Ley, Lloyd, Martinez, Mayer,

McCutcheon, Miller, Collette Millitello, Joseph Millitello, Morris, Moss, Murphy, Napper,

Nicholas, Panko, Pounds, Rideout, Rodriguez, Schafer, Schuck, Seman, Shilakes, Sweeney,

Talaski, Tomcsik, Nicole Turcheck, Robert Turcheck, Wahler, Walbrook, Whiteside, Yalkin, and

Zreik, and Aapex, American Nationwide, CBB, North Amercan Home, Owner Realty, Premier,

Quotemearate, and Real Estate One, through their agents, conspired to acquire and gain control

over mortgage loan proceeds while concealing the true nature of the loan transactions, participate

in the laundering of the mortgage loan proceeds illegally obtained, engage in both straw and

ghost loan transactions, and make misrepresentations about the conduct of themselves and others,

upon which Fremont reasonably relied.

226.    As a direct and proximate cause of the actions taken in furtherance of this

conspiracy, Fremont was damaged in an amount not yet determined, but believed to be in excess

of $20,000,000.

### Aiding and Abetting Fraud

**Fremont v. Defendants Zundel, Wells,
Richardson, Peters, Sturgeon, Aapex, American Nationwide,
CBB, First Escrow, Hardcore Motorsports, Hardcore
Racing, JS Realty, Lawyers Escrow, Liberty Title,
MotorCity, Nations Title, North American Home, Owner Realty,
Premier, Quotemearate, Real Estate One, Specialty Holdings,
Auty, Baker, Bastien, Bazzi, Ali Baydoun, Jay Baydoun,
Bennett, Bevensee, Kevin Bos, Lisa Bos, Brierley, Dees,
Frank Gendernalik, Susan Gendernalik,
Hall, James, Kent, Lara, Larsen, Ley, Lloyd, Martinez,
Mayer, McCutcheon, Miller, Collette Millitello,
Joseph Millitello, Morris, Moss, Murphy,
Napper, Nicholas, Panko, Pounds, Rideout, Rodriguez,
Schafer, Schuck, Seman, Shilakes, Sweeney,
Talaksi, Tomcsik, Nicole Turcheck, Robert Turcheck,
Wahler, Walbrook, Whiteside, Yalkin, and Zreik**

227.    Plaintiff realleges paragraphs 1 through 226 as if set forth verbatim herein.

228.    Zundel, Wells, Richardson, Peters, Sturgeon, First Escrow, Hardcore Motorsports,

Hardcore Racing, JS Realty, Lawyers Escrow, Liberty Title, MotorCity, Nations Title, Specialty

Holdings, Auty, Baker, Bastien, Bazzi, Ali Baydoun, Jay Baydoun, Bennett, Bevensee, Kevin

Bos, Lisa Bos, Brierley, Dees, Frank Gendernalik, Susan Gendernalik, Hall, James, Kent, Lara,

Larsen, Ley, Lloyd, Martinez, Mayer, McCutcheon, Miller, Collette Millitello, Joseph Millitello,

Morris, Moss, Murphy, Napper, Nicholas, Panko, Pounds, Rideout, Rodriguez, Schafer, Schuck, Seman, Shilakes, Sweeney, Talaski, Tomcsik, Nicole Turcheck, Robert Turcheck, Wahler, Walbrook, Whiteside, Yalkin, and Zreik, and Aapex, American Nationwide, CBB, North Amercan Home, Owner Realty, Premier, Quotemearate, and Real Estate One, through their agents, each assisted Duke in his scheme to defraud through the conduct described above.

229.   At the time they assisted Duke, defendants Zundel, Wells, Richardson, Peters, Sturgeon, First Escrow, Hardcore Motorsports, Hardcore Racing, JS Realty, Lawyers Escrow, Liberty Title, MotorCity, Nations Title, Specialty Holdings, Auty, Baker, Bastien, Bazzi, Ali Baydoun, Jay Baydoun, Bennett, Bevensee, Kevin Bos, Lisa Bos, Brierley, Dees, Frank Gendernalik, Susan Gendernalik, Hall, James, Kent, Lara, Larsen, Ley, Lloyd, Martinez, Mayer, McCutcheon, Miller, Collette Millitello, Joseph Millitello, Morris, Moss, Murphy, Napper, Nicholas, Panko, Pounds, Rideout, Rodriguez, Schafer, Schuck, Seman, Shilakes, Sweeney, Talaski, Tomcsik, Nicole Turcheck, Robert Turcheck, Wahler, Walbrook, Whiteside, Yalkin, and Zreik, and Aapex, American Nationwide, CBB, North Amercan Home, Owner Realty, Premier, Quotemearate, and Real Estate One, through their agents, each knew that Duke sought to acquire and gain control of mortgage loan proceeds while concealing from others his control.  In addition, Zundel, Wells, Richardson, Peters, Sturgeon, First Escrow, Hardcore Motorsports, Hardcore Racing, JS Realty, Lawyers Escrow, Liberty Title, MotorCity, Nations Title, Specialty Holdings, Auty, Baker, Bastien, Bazzi, Ali Baydoun, Jay Baydoun, Bennett, Bevensee, Kevin Bos, Lisa Bos, Brierley, Dees, Frank Gendernalik, Susan Gendernalik, Hall, James, Kent, Lara, Larsen, Ley, Lloyd, Martinez, Mayer, McCutcheon, Miller, Collette Millitello, Joseph Millitello, Morris, Moss, Murphy, Napper, Nicholas, Panko, Pounds, Rideout, Rodriguez, Schafer, Schuck,

Seman, Shilakes, Sweeney, Talaski, Tomcsik, Nicole Turcheck, Robert Turcheck, Wahler, Walbrook, Whiteside, Yalkin, and Zreik, and Aapex, American Nationwide, CBB, North Amercan Home, Owner Realty, Premier, Quotemearate, and Real Estate One, through their agents, each knew, or purposefully contrived to avoid learning, that Duke sought to launder funds through a variety of methods.

230.    As a direct result of Duke's scheme to defraud, Fremont was damaged in an amount not yet determined, but believed to be in excess of $20,000,000.

## Count II

### Additional Claim Against Duke, Richardson, and Wells

### Statutory Conversion

231.     Plaintiff realleges paragraphs 1 through 230 as if fully set forth verbatim herein.

232.     Duke Richardson, and Wells stole and/or embezzled and/or converted Fremont's money to their own use.

233.     Pursuant to Mich. Comp. Laws § 600.2919a(1), Fremont is entitled to recover three times the amount of actual damages sustained, in an amount yet to be determined, plus costs and reasonable attorneys' fees.

## Count III

## Additional Claim Against Hardcore Racing and Hardcore Motorsports

### Statutory Conversion

234.    Plaintiff realleges paragraphs 1 through 233 as if fully set forth verbatim herein.

235.    Hardcore Racing and Hardcore Motorsports received, possessed, concealed, and/or aided in the concealment of money stolen, embezzled or converted from Fremont, knowing that this money was stolen, embezzled, or converted.

236.    Pursuant to Mich. Comp. Laws § 600.2919a(1), Fremont is entitled to recover three times the amount of actual damages sustained, in an amount yet to be determined, plus costs and reasonable attorneys' fees.

## Count IV

## Additional Claims Against Aapex

237.   Plaintiff realleges paragraphs 1 through 120 as if fully set forth verbatim herein.

238.   At all relevant times herein, Aapex was a mortgage loan brokerage licensed to do business in the state of Michigan.

239.   On February 1, 2000, Aapex entered into a nonexclusive Wholesale Brokerage Agreement (the "Aapex Agreement") with Fremont whereby Aapex agreed to submit loan packages to Fremont on behalf of Aapex's clients for possible funding.

240.   In the event that Fremont funded a loan to a Aapex client and that loan closed, Aapex would be paid certain fees for its services.

241.   Aapex represented and warranted to Fremont in the Aapex Agreement that "[t]o the best of [Aapex's] knowledge, after due inquiry, each Loan Application Package submitted by [Aapex] to [Fremont] is true and correct in all material respects and does not fail to include any information required to be stated or necessary to make each such Loan Application Package not misleading."

242.   During some or all of the relevant time herein, Aapex employed Nicole Turcheck as a loan officer.

243.   Aapex, through its loan officer and agent Nicole Turcheck, submitted a false and fraudulent loan application in connection with the transaction (o) identified in paragraph 101. Fremont reasonably relied upon the false and fraudulent loan application when it agreed to fund the loan and transfer the loan proceeds in that transaction.

**Breach of Contract**

**Fremont v. Aapex**

244.    Plaintiff realleges paragraphs 1 through 120 and 237 through 243 as if fully set forth verbatim herein.

245.    In connection with transaction (o) identified in paragraph 101, Aapex breached the Aapex Agreement because it submitted a false and fraudulent loan application.

246.    As a direct and proximate result of Aapex's breach of contract, Fremont was damaged in an amount not yet determined, but believed to be in excess of $260,000.

**Common Law Fraud**

**Fremont v. Aapex**

247.    Plaintiff realleges paragraphs 1 through 120 and 237 through 246 as if fully set forth verbatim herein.

248.    In transaction (o) identified in paragraph 101, Aapex's agent Nicole Turcheck engaged in fraud through the conduct alleged above.

249.    Aapex put Nicole Turcheck in a position where she could defraud Fremont while acting within her actual or apparent authority as agent for Aapex.

250.    As a direct and proximate cause of the fraud of Aapex's agent Nicole Turcheck, Fremont was damaged in an amount not yet determined, but believed to be in excess of $260,000.

79

## Negligence

### Fremont v. Aapex

251.   Plaintiff realleges paragraphs 1 through 120 and 237 through 250 as if fully set forth verbatim herein.

252.   Aapex owed Fremont a duty to exercise ordinary and reasonable care in the submission of loan application packages to Fremont for possible funding.

253.   This duty included an obligation to disclose all information material to Fremont's lending decision and a duty not to engage in fraudulent or misleading practices.

254.   Aapex breached that duty by negligently submitting a false loan application package in connection with transaction (o) identified in paragraph 101.

255.   As a direct and proximate cause of Aapex's negligence, Fremont was damaged in an amount not yet determined, but believed to be in excess of $260,000.

## Negligent Hiring/Retention

### Fremont v. Aapex

256.   Plaintiff realleges paragraphs 1 through 120 and 237 through 255 as if fully set forth verbatim herein.

257.   Aapex employed Nicole Turcheck for the purpose of brokering mortgages in Michigan, including with Fremont.

258.   Nicole Turcheck was unfit, incompetent and dangerous for this purpose and with the exercise of reasonable and ordinary care Aapex knew or should have known this at the time it hired Nicole Turcheck and throughout the time it retained Nicole Turcheck as an employee.

80

259.   Aapex failed to exercise reasonable or ordinary care to adequately supervise Nicole Turcheck.

260.   As a direct and proximate cause of Aapex's negligence, Fremont was damaged in an amount not yet determined, but believed to be in excess of $260,000.

## Count V

## Additional Claims Against American Nationwide

261.    Plaintiff realleges paragraphs 1 through 120 as if fully set forth verbatim herein.

262.    At all relevant times herein, American Nationwide was a mortgage loan brokerage licensed to do business in the state of Michigan.

263.    On November 13, 1998, American Nationwide entered into a nonexclusive Loan Purchase Agreement (the "American Nationwide Agreement") with Fremont whereby American Nationwide agreed, among other things, to submit loan files to Fremont on behalf of American Nationwide's clients for possible funding.

264.    American Nationwide represented and warranted to Fremont in the American Nationwide Agreement that "[a]ll Mortgage Loan Documents submitted to [Fremont] are genuine and complete, enforceable against Borrower as written, subject to equitable principles and bankruptcy laws. All other representations about each Mortgage Loan are accurate and meet the terms of the Commitment to Purchase. No writing or other document submitted to [Fremont], whether authored by [American Nationwide] or contained in the Loan file, states any false or misleading facts or omits facts necessary to prevent [Fremont] from being misled."

265.    During some or all of the relevant time herein, American Nationwide employed Larsen as a loan officer.

266.    American Nationwide, through its loan officer and agent Larsen, submitted false and fraudulent loan applications in connection with the transactions (cc), (ee), (gg), and (hh) identified in paragraph 102. Fremont reasonably relied upon the false and fraudulent loan

applications when it agreed to fund the loans and transfer the loan proceeds in each of those transactions.

## Breach of Contract

### Fremont v. American Nationwide

267.   Plaintiff realleges paragraphs 1 through 120 and 261 through 266 as if fully set forth verbatim herein.

268.   In connection with transactions (cc), (ee), (gg), and (hh) identified in paragraph 102, American Nationwide breached the American Nationwide Agreement because it submitted false and fraudulent loan applications.

269.   As a direct and proximate result of American Nationwide's breach of contract, Fremont was damaged in an amount not yet determined, but believed to be in excess of $1,900,000.

## Common Law Fraud

### Fremont v. American Nationwide

270.   Plaintiff realleges paragraphs 1 through 120 and 261 through 269 as if fully set forth verbatim herein.

271.   In transactions (cc), (ee), (gg), and (hh) identified in paragraph 102, American Nationwide's agent Larsen engaged in fraud through the conduct alleged above.

272.   American Nationwide put Larsen in a position where he could defraud Fremont while acting within his actual or apparent authority as agent for American Nationwide.

273.   As a direct and proximate cause of the fraud of American Nationwide's agent Larsen, Fremont was damaged in an amount not yet determined, but believed to be in excess of $1,900,000.

## Negligence

### Fremont v. American Nationwide

274.   Plaintiff realleges paragraphs 1 through 120 and 261 through 273 as if fully set forth verbatim herein

275.   American Nationwide owed Fremont a duty to exercise ordinary and reasonable care in the submission of loan application packages to Fremont for possible funding.

276.   This duty included an obligation to disclose all information material to Fremont's lending decision and a duty not to engage in fraudulent or misleading practices.

277.   American Nationwide breached that duty by negligently submitting a false loan application package in connection with transactions (cc), (ee), (gg), and (hh) identified in paragraph 102.

278.   As a direct and proximate cause of American Nationwide's negligence, Fremont was damaged in an amount not yet determined, but believed to be in excess of $1,900,000.

## Negligent Hiring/Retention

### Fremont v. American Nationwide

279.   Plaintiff realleges paragraphs 1 through 120 and 261 through 278 as if fully set forth verbatim herein.

280.   American Nationwide employed Larsen for the purpose of brokering mortgages in Michigan, including with Fremont.

281.   Larsen was unfit, incompetent and dangerous for this purpose and with the exercise of reasonable and ordinary care American Nationwide knew or should have known this at the time it hired Larsen and throughout the time it retained Larsen as an employee.

282.   American Nationwide failed to exercise reasonable or ordinary care to adequately supervise Larsen.

283.   As a direct and proximate cause of American Nationwide's negligence, Fremont was damaged in an amount not yet determined, but believed to be in excess of $1,900,000.

## Count VI

## Additional Claims Against CBB

284.    Plaintiff realleges paragraphs 1 through 120 as if fully set forth verbatim herein.

285.    At all relevant times herein, CBB was a mortgage loan brokerage licensed to do business in the state of Michigan.

286.    On April 8, 2003, CBB entered into a nonexclusive Mortgage Broker Agreement (the "CBB Agreement") with Fremont whereby CBB agreed to submit loan packages to Fremont on behalf of CBB's clients for possible funding.

287.    In the event that Fremont funded a loan to a CBB client and that loan closed, CBB would be paid certain fees for its services.

288.    CBB represented and warranted to Fremont in the CBB Agreement that "none of the statements or information contained in any Loan package is false or erroneous, or omits material facts necessary to make such statements or information complete, accurate and understandable."

289.    During some or all of the relevant time herein, CBB employed Rodriguez and Sturgeon as loan officers.

290.    CBB, through its loan officers and agents Rodriguez and Sturgeon, submitted false and fraudulent loan applications in connection with the transactions (a), (b), (e), (g), (h), (i), (j), (k), (l), (n), and (q) identified in paragraph 101 and in connection with the transactions (b), (c), (d), (e), (f), (i), (k), (l), (m), (q), (r), (v), (x), (y), (z), (oo), and (pp) identified in paragraph 102. Fremont reasonably relied upon the false and fraudulent loan applications when it agreed to fund the loans and transfer the loan proceeds in each of those transactions.

**Breach of Contract**

**Fremont v. CBB**

291.   Plaintiff realleges paragraphs 1 through 120 and 284 through 290 as if fully set forth verbatim herein.

292.   In connection with transactions (a), (b), (e), (g), (h), (i), (j), (k), (l), (n), and (q) identified in paragraph 101 and in connection with the transactions (b), (c), (d), (e), (f), (i), (k), (l), (m), (q), (r), (v), (x), (y), (z), (oo), and (pp) identified in paragraph 102, CBB breached the CBB Agreement because it submitted false and fraudulent loan applications.

293.   As a direct and proximate result of CBB's breach of contract, Fremont was damaged in an amount not yet determined, but believed to be in excess of $9,000,000.

**Common Law Fraud**

**Fremont v. CBB**

294.   Plaintiff realleges paragraphs 1 through 120 and 284 through 293 as if fully set forth verbatim herein.

295.   In transactions (a), (b), (e), (g), (h), (i), (j), (k), (l), (n), and (q) identified in paragraph 101 and in connection with the transactions (b), (c), (d), (e), (f), (i), (k), (l), (m), (q), (r), (v), (x), (y), (z), (oo), and (pp) identified in paragraph 102, CBB's agents Rodriguez and/or Sturgeon engaged in fraud through the conduct alleged above.

296.   CBB put Rodriguez and Sturgeon in a position where they could defraud Fremont while acting within their actual or apparent authority as agents for CBB.

87

297.   As a direct and proximate cause of the fraud of CBB's agents Rodriguez and Sturgeon, Fremont was damaged in an amount not yet determined, but believed to be in excess of $9,000,000.

## Negligence

### Fremont v. CBB

298.   Plaintiff realleges paragraphs 1 through 120 and 284 through 297 as if fully set forth verbatim herein.

299.   CBB owed Fremont a duty to exercise ordinary and reasonable care in the submission of loan application packages to Fremont for possible funding.

300.   This duty included an obligation to disclose all information material to Fremont's lending decision and a duty not to engage in fraudulent or misleading practices.

301.   CBB breached that duty by negligently submitting false loan application packages in connection with transactions (a), (b), (e), (g), (h), (i), (j), (k), (l), (n), and (q) identified in paragraph 101 and in connection with the transactions (b), (c), (d), (e), (f), (i), (k), (l), (m), (q), (r), (v), (x), (y), (z), (oo), and (pp) identified in paragraph 102.

302.   As a direct and proximate cause of CBB's negligence, Fremont was damaged in an amount not yet determined, but believed to be in excess of $9,000,000.

## Negligent Hiring/Retention

### Fremont v. CBB

303.   Plaintiff realleges paragraphs 1 through 120 and 284 through 302 as if fully set forth verbatim herein.

304.   CBB employed Rodriguez and Sturgeon for the purpose of brokering mortgages in Michigan, including with Fremont.

305.   Rodriguez and Sturgeon were unfit, incompetent and dangerous for this purpose and with the exercise of reasonable and ordinary care CBB knew or should have known this at the time it hired Rodriguez and Sturgeon and throughout the time it retained Rodriguez and Sturgeon as employees.

306.   CBB failed to exercise reasonable or ordinary care to adequately supervise Rodriguez and Sturgeon.

307.   As a direct and proximate cause of CBB's negligence, Fremont was damaged in an amount not yet determined, but believed to be in excess of $9,000,000.

## Count VII

## Additional Claims Against North American

308.    Plaintiff realleges paragraphs 1 through 120 as if fully set forth verbatim herein.

309.    At all relevant times herein, North American was a mortgage loan brokerage licensed to do business in the state of Michigan.

310.    On June 30, 2006, North American entered into a nonexclusive Mortgage Broker Agreement (the "North American Agreement") with Fremont whereby North American agreed to submit loan packages to Fremont on behalf of North American's clients for possible funding.

311.    In the event that Fremont funded a loan to a North American client and that loan closed, North American would be paid certain fees for its services.

312.    North American represented and warranted to Fremont in the North American Agreement that "none of the statements or information contained in any Loan package is false or erroneous, or omits material facts necessary to make such statements or information complete, accurate and understandable."

313.    During some or all of the relevant time herein, North American employed Bennett as a loan officer.

314.    North American, through its loan officer and agent Bennett, submitted false and fraudulent loan applications in connection with the transactions (dd), (ff), (ii), (jj), and (ll) identified in paragraph 102.  Fremont reasonably relied upon the false and fraudulent loan applications when it agreed to fund the loans and transfer the loan proceeds in each of those transactions.

**Breach of Contract**

**Fremont v. North American**

315.     Plaintiff realleges paragraphs 1 through 120 and 308 through 314 as if fully set forth verbatim herein.

316.     In connection with transactions (dd), (ff), (ii), (jj), and (ll) identified in paragraph 102, North American breached the North American Agreement because it submitted false and fraudulent loan applications.

317.     As a direct and proximate result of North American's breach of contract, Fremont was damaged in an amount not yet determined, but believed to be in excess of $1,600,000.

**Common Law Fraud**

**Fremont v. North American**

318.     Plaintiff realleges paragraphs 1 through 120 and 308 through 317 as if fully set forth verbatim herein.

319.     In transactions (dd), (ff), (ii), (jj), and (ll) identified in paragraph 102, North American's agent Bennett engaged in fraud through the conduct alleged above.

320.     North American put Bennett in a position where she could defraud Fremont while acting within her actual or apparent authority as agent for North American.

321.     As a direct and proximate cause of the fraud of North American's agent Bennett, Fremont was damaged in an amount not yet determined, but believed to be in excess of $1,600,000.

## Negligence

### Fremont v. North American

322.    Plaintiff realleges paragraphs 1 through 120 and 308 through 321 as if fully set forth verbatim herein.

323.    North American owed Fremont a duty to exercise ordinary and reasonable care in the submission of loan application packages to Fremont for possible funding.

324.    This duty included an obligation to disclose all information material to Fremont's lending decision and a duty not to engage in fraudulent or misleading practices.

325.    North American breached that duty by negligently submitting false loan application packages in connection with transactions (dd), (ff), (ii), (jj), and (ll) identified in paragraph 102.

326.    As a direct and proximate cause of North American's negligence, Fremont was damaged in an amount not yet determined, but believed to be in excess of $1,600,000.

## Negligent Hiring/Retention

### Fremont v. North American

327.    Plaintiff realleges paragraphs 1 through 120 and 308 through 326 as if fully set forth verbatim herein.

328.    North American employed Bennett for the purpose of brokering mortgages in Michigan, including with Fremont.

329.    Bennett was unfit, incompetent and dangerous for this purpose and with the exercise of reasonable and ordinary care North American knew or should have known this at the time it hired Bennett and throughout the time it retained Bennett as an employee.

330.    North American failed to exercise reasonable or ordinary care to adequately supervise Bennett.

331.    As a direct and proximate cause of North American's negligence, Fremont was damaged in an amount not yet determined, but believed to be in excess of $1,600,000.

## Count VIII

### Additional Claims Against Premier

332.   Plaintiff realleges paragraphs 1 through 120 as if fully set forth verbatim herein.

333.   At all relevant times herein, Premier was a mortgage loan brokerage licensed to do business in the state of Michigan.

334.   On April 1, 2002, Premier entered into a nonexclusive Mortgage Broker Agreement (the "Premier Agreement") with Fremont whereby Premier agreed to submit loan packages to Fremont on behalf of Premier's clients for possible funding.

335.   In the event that Fremont funded a loan to a Premier client and that loan closed, Premier would be paid certain fees for its services.

336.   Premier represented and warranted to Fremont in the Premier Agreement that "none of the statements or information contained in any Loan package is false or erroneous, or omits material facts necessary to make such statements or information complete, accurate and understandable."

337.   During some or all of the relevant time herein, Premier employed Sturgeon and Bennett as loan officers.

338.   Premier, through its loan officers and agents Sturgeon and Bennett, submitted false and fraudulent loan applications in connection with the transactions (d), (f), and (m) identified in paragraph 101 and transactions (o), (p), (s), (t), (w), (aa), and (bb) identified in paragraph 102. Fremont reasonably relied upon the false and fraudulent loan applications when it agreed to fund the loans and transfer the loan proceeds in each of those transactions.

**Breach of Contract**

**Fremont v. Premier**

339.   Plaintiff realleges paragraphs 1 through 120 and 332 through 336 as if fully set forth verbatim herein.

340.   In connection with transactions (d), (f), and (m) identified in paragraph 101 and transactions (o), (p), (s), (t), (w), (aa), and (bb) identified in paragraph 102, Premier breached the Premier Agreement because it submitted false and fraudulent loan applications.

341.   As a direct and proximate result of Premier's breach of contract, Fremont was damaged in an amount not yet determined, but believed to be in excess of $2,800,000.

**Common Law Fraud**

**Fremont v. Premier**

342.   Plaintiff realleges paragraphs 1 through 120 and 332 through 341 as if fully set forth verbatim herein.

343.   In transactions (d), (f), and (m) identified in paragraph 101 and transactions (o), (p), (s), (t), (w), (aa), and (bb) identified in paragraph 102, Premier's agents Sturgeon and Bennett engaged in fraud through the conduct alleged above.

344.   Premier put Sturgeon and Bennett in a position where they could defraud Fremont while acting within their actual or apparent authority as agents for Premier.

345.   As a direct and proximate cause of the fraud of Premier's agents Sturgeon and Bennett, Fremont was damaged in an amount not yet determined, but believed to be in excess of $2,800,000.

## Negligence

### Fremont v. Premier

346.    Plaintiff realleges paragraphs 1 through 120 and 332 through 345 as if fully set forth verbatim herein.

347.    Premier owed Fremont a duty to exercise ordinary and reasonable care in the submission of loan application packages to Fremont for possible funding.

348.    This duty included an obligation to disclose all information material to Fremont's lending decision and a duty not to engage in fraudulent or misleading practices.

349.    Premier breached that duty by negligently submitting false loan application packages in connection with transactions (d), (f), and (m) identified in paragraph 101 and transactions (o), (p), (s), (t), (w), (aa), and (bb) identified in paragraph 102.

350.    As a direct and proximate cause of Premier's negligence, Fremont was damaged in an amount not yet determined, but believed to be in excess of $2,800,000.

## Negligent Hiring/Retention

### Fremont v. Premier

351.    Plaintiff realleges paragraphs 1 through 120 and 332 through 350 as if fully set forth verbatim herein.

352.    Premier employed Bennett and Sturgeon for the purpose of brokering mortgages in Michigan, including with Fremont.

353.    Bennett and Sturgeon were unfit, incompetent and dangerous for this purpose and with the exercise of reasonable and ordinary care Premier knew or should have known this at the

time it hired Bennett and Sturgeon and throughout the time it retained Bennett and Sturgeon as employees.

354.    Premier failed to exercise reasonable or ordinary care to adequately supervise Bennett and Sturgeon.

355.    As a direct and proximate cause of Premier's negligence, Fremont was damaged in an amount not yet determined, but believed to be in excess of $2,800,000.

## Count IX

## Additional Claims Against Quotemearate

356.   Plaintiff realleges paragraphs 1 through 120 as if fully set forth verbatim herein.

357.   At all relevant times herein, Quotemearate was a mortgage loan brokerage licensed to do business in the state of Michigan.

358.   On October 30, 2003, Quotemearate entered into a nonexclusive Mortgage Broker Agreement (the "Quotemearate Agreement") with Fremont whereby Quotemearate agreed to submit loan packages to Fremont on behalf of Quotemearate's clients for possible funding.

359.   In the event that Fremont funded a loan to a Quotemearate client and that loan closed, Quotemearate would be paid certain fees for its services.

360.   Quotemearate represented and warranted to Fremont in the Quotemearate Agreement that "none of the statements or information contained in any Loan package is false or erroneous, or omits material facts necessary to make such statements or information complete, accurate and understandable."

361.   During some or all of the relevant time herein, Quotemearate employed Sturgeon as a loan officer.

362.   Quotemearate, through its loan officer and agent Sturgeon, submitted false and fraudulent loan applications in connection with the transactions (g), (h), (j), and (n) identified in paragraph 102.  Fremont reasonably relied upon the false and fraudulent loan applications when it agreed to fund the loans and transfer the loan proceeds in each of those transactions.

98

**Breach of Contract**

**Fremont v. Quotemearate**

363.     Plaintiff realleges paragraphs 1 through 120 and 356 through 362 as if fully set forth verbatim herein.

364.     In connection with transactions (g), (h), (j), and (n) identified in paragraph 102, Quotemearate breached the Quotemearate Agreement because it submitted false and fraudulent loan applications.

365.     As a direct and proximate result of Quotemearate's breach of contract, Fremont was damaged in an amount not yet determined, but believed to be in excess of $1,500,000.

**Common Law Fraud**

**Fremont v. Quotemearate**

366.     Plaintiff realleges paragraphs 1 through 120 and 356 through 365 as if fully set forth verbatim herein.

367.     In transactions (g), (h), (j), and (n) identified in paragraph 102, Quotemearate's agent Sturgeon engaged in fraud through the conduct alleged above.

368.     Quotemearate put Sturgeon in a position where he could defraud Fremont while acting within his actual or apparent authority as agent for Quotemearate.

369.     As a direct and proximate cause of the fraud of Quotemearate's agent Sturgeon, Fremont was damaged in an amount not yet determined, but believed to be in excess of $1,500,000.

## Negligence

### Fremont v. Quotemearate

370.    Plaintiff realleges paragraphs 1 through 120 and 356 through 369 as if fully set forth verbatim herein

371.    Quotemearate owed Fremont a duty to exercise ordinary and reasonable care in the submission of loan application packages to Fremont for possible funding.

372.    This duty included an obligation to disclose all information material to Fremont's lending decision and a duty not to engage in fraudulent or misleading practices.

373.    Quotemearate breached that duty by negligently submitting false loan application packages in connection with transactions (g), (h), (j), and (n) identified in paragraph 102.

374.    As a direct and proximate cause of Quotemearate's negligence, Fremont was damaged in an amount not yet determined, but believed to be in excess of $1,500,000.

## Negligent Hiring/Retention

### Fremont v. Quotemearate

375.    Plaintiff realleges paragraphs 1 through 120 and 356 through 374 as if fully set forth verbatim herein.

376.    Quotemearate employed Sturgeon for the purpose of brokering mortgages in Michigan, including with Fremont.

377.    Sturgeon was unfit, incompetent and dangerous for this purpose and with the exercise of reasonable and ordinary care Quotemearate knew or should have known this at the time it hired Sturgeon and throughout the time it retained Sturgeon as an employee.

378.   Quotemearate failed to exercise reasonable or ordinary care to adequately supervise Sturgeon.

379.   As a direct and proximate cause of Quotemearate's negligence, Fremont was damaged in an amount not yet determined, but believed to be in excess of $1,500,000.

## COUNT X

## Claims Against Fidelity

380.    Plaintiff realleges paragraphs 1 through 120 as if fully set forth verbatim herein.

381.    At all times relevant herein, Fidelity was a title insurance underwriter that provided title insurance and escrow and other title-related services throughout the country, including in Michigan.

382.    Generally, mortgage lenders buy title insurance policies to assure good and marketable title to real estate and to assure they have priority of lien.  In a typical residential real estate transaction, either a mortgage lender or a borrower or both will place an order with a title insurance underwriter for the issuance of a title policy.

383.    After receiving the order, a title officer typically prepares a preliminary title report outlining:  the current status of title to the property, any exclusions the title company might include in the policy, and specific issues to be addressed or resolved before the title policy will be issued.  This preliminary report is known as a title commitment.

384.    Just prior to the close of the loan transaction, a mortgage lender will provide closing instructions to an issuing agent of the title insurance underwriter directing how the mortgage proceeds should be distributed and how the transaction should be documented.

385.    Also just prior to the close of the loan transaction, a title insurance underwriter and/or its issuing agent, at the request of the mortgage lender, will issue a closing protection letter ("CPL").  A CPL indemnifies the lender from losses arising from the failure of the issuing agent to comply with the lender's closing instructions and from fraud on the part of the issuing agent.

386.  After a loan transaction is closed and all mortgage proceeds have been released and distributed, the title insurance underwriter issues a title insurance policy.  A title insurance policy issued to a mortgage lender is known as a Loan Policy of Title Insurance ("Lender's Policy").  A Lender's Policy insures the mortgage lender against any defect in title affecting the priority of the mortgage lien in an amount up to the outstanding balance of the mortgage loan.

387.  From 2004 to 2007, Fidelity issued title commitments, CPLs and/or Lender's Policies to Fremont in connection with at least nineteen straw and ghost loan transactions involving Duke and his co-conspirators, listed below.  Fidelity issued a title commitment and CPL directly in the following transaction:

> Suzanne Nicholas
> 9027 Potterville Dr.
> Augusta, MI 48191
> 11/10/05

388.  Fidelity issued a title commitment, CPL and Lender's Policy in the following transaction through issuing agent Metro-West Title Agency, Inc. ("Metro-West"):

> Brian Murphy/Donna Galante
> 32308 Church St.
> Rockwood, MI 48173
> 12/6/04

389.  At the time of this transaction, Metro-West was an authorized issuing agent for Fidelity.

390.  Fidelity issued a title commitment, CPL and Lender's Policy in the following transactions through issuing agent American Title Company of Washtenaw ("American Title"):

  a.  Danny Ley
      736 Miller
      Ann Arbor, MI 48103
      8/24/06

  b.  Danny Ley
      738 Miller
      Ann Arbor, MI 48103
      8/28/06

391. At the time of these transactions, American Title was an authorized issuing agent for Fidelity.

392. Fidelity issued a title commitment, CPL and/or Lender's Policy (as indicated) in the following transactions through issuing agent Nations Title:

  a.  Larry Yount
      7763 N. Inkster Rd.
      Westland, MI 48185
      10/26/05
      Title commitment, CPL and Lender's Policy

  b.  Morgan Bevensee
      802 Mt. Vernon Blvd.
      Royal Oak, MI 48073
      12/12/05
      Title commitment, CPL and Lender's Policy

  c.  Kevin Bos
      3165 Kenrick St.
      Keego Harbor, MI 48320
      2/10/06
      Title commitment and CPL

  d.  Linda Wahler
      6485 Shannon Glen Dr.
      Fenton, MI 48430
      7/11/06
      Title commitment and CPL

e.  John Mayer, Jr.
    4590 Valleyview Dr.
    West Bloomfield, MI 48323
    10/10/06
    Title commitment and CPL

f.  Kathleen Pounds
    1977 Ridge Rd.
    White Lake, MI 48383
    10/18/06
    Title commitment and CPL

g.  Patrick Lloyd
    4400 Timber Lake Trail #6
    Highland, MI 48357
    Title commitment and CPL

h.  Ray Hall
    371 Hunters Ridge
    Brandon TWP, MI 48462
    10/24/06
    Title commitment and CPL

i.  Ray Hall
    372 Hunters Ridge
    Brandon TWP, MI 48462
    10/24/06
    Title commitment and CPL

j.  Larry Rideout
    11280 Tyrone Trail
    Fenton, MI 48430
    11/30/06
    Title commitment and CPL

k.  Ronald Talaski Jr.
    3999 Fenmore Ave.
    Waterford, MI 48328
    12/14/06
    Title commitment and CPL

l.   Kim Kent
     45996 Windridge Lane
     Canton, MI 48188
     12/20/06
     Title commitment and CPL

m.   John Mayer Jr.
     6861 Corrigan Dr.
     Brighton, MI 48116
     12/27/06
     Title commitment and CPL

n.   April Miller
     3338 Cummings Ave.
     Royal Oak, MI 48073
     12/29/06
     Title commitment and CPL

o.   Kim Marie Kent
     3356 Talbert Circle #187
     Rochester Hills, MI 48307
     2/14/07
     Title commitment and CPL

393.   Fidelity maintains that it terminated Nations Title's agency as of May 11, 2006.

Fidelity, however, did not advise Fremont of its alleged termination of Nations Title's agency.

Based on the investigation to date, Fidelity also did not advise the general public of the

termination of Nations Title's agency or otherwise expressly disavow its agency relationship with

Nations Title.

394.   Based on the investigation to date, Fidelity failed to take steps to collect its

supplies, equipment and other indicia of authority from Nations Title after it allegedly terminated

Nations Title's agency.  For example, Nations Title continued to issue CPLs on Fidelity

letterhead stationery after May 11, 2006, up to at least February 2007.

106

### Breach of Contract Under the CPLs

### Fremont v. Fidelity

395.   Plaintiff realleges paragraphs 1 through 120 and 380 through 394 as if fully set forth verbatim herein.

396.   In connection with transactions (c) through (o) identified in paragraph 392, Fidelity issued, through its agent Nations Title, a CPL that provided in pertinent part:

> When title insurance of Fidelity National Title Insurance Company ("Company") is specified for your protection in connection with closings of real estate transactions in which you are . . . a lender secured by a mortgage. . . the Company. . . hereby agrees to reimburse you for actual loss incurred by you in connection with such closings when conducted by an Issuing Agent. . . and when such loss arises out of:
>
> 1.      Failure of the Issuing Agent . . . to comply with your written closing instructions to the extent that they relate to (a) the status of the title to said interest in land or the validity, enforceability and priority of the lien of said mortgage or said interest in land. . . or
>
> 2.      Fraud of said Issuing Agent . . . in handling your funds or documents in connection with such closings to the extent such fraud affects the status of the title to said interest in land, or the validity, enforceability or priority of said mortgage or said interest in land.

397.   The transactions (c) through (o) identified in paragraph 392 were closed by Nations Title as agent for Fidelity.

398.   In the alternative, although Fidelity maintains it terminated Nations Title's agency, Fidelity failed to notify Fremont that Nations Title was no longer its authorized agent and otherwise failed to take reasonable steps to prevent Nations Title from representing itself as an

issuing agent of Fidleity.  Thus, Nations Title acted with apparent authority when it issued the CPLs.

399.    In connection with transactions (c) through (o) identified in paragraphs 392, Nations Title fabricated and forged key loan documents including the mortgage, mortgage note and warranty deed.

400.    In connection with transactions (c) through (o) identified in paragraph 392, Nations Title failed to comply with Fremont's closing instructions because Fremont's mortgage and mortgage note were not recorded.

401.    Fremont has submitted claims to Fidelity under each of the CPLs issued in connection with transactions (c) through (o) identified in paragraph 392, arising from Nations Title's fraud and failure to comply with Fremont's closing instructions.  Fidelity, however, has refused to indemnify Fremont for its losses arising therefrom.

402.    By refusing to indemnify Fremont under the CPLs, Fidelity has breached the terms of the CPLs.

403.    As a direct and proximate result of Fidelity's breach of contract, Fremont was damaged in an amount not yet determined, but believed to be in excess of $4,000,000.

**Common Law Fraud**

**Fremont v. Fidelity**

404.    Plaintiff realleges paragraphs 1 through 120 and 380 through 403 as if fully set forth verbatim herein.

405.    In transactions (c) through (o) identified in paragraph 392, Fidelity's issuing agent, Nations Title, engaged in fraud through the conduct alleged above.

406.   Fidelity put Nations Title in a position where it could defraud Fremont while acting within its actual or apparent authority as agent for Fidelity.

407.   As a direct and proximate cause of the fraud of Fidelity's issuing agent, Nations Title, Fremont was damaged in an amount not yet determined, but believed to be in excess of $4,000,000.

## Violation of the Michigan Consumer Protection Act

## Fremont v. Fidelity

408.   Plaintiffs reallege paragraphs 1 through 120 and 380 through 407 as if fully set forth verbatim herein.

409.   At all times relevant herein, the Michigan Consumer Protection Act ("MCPA"), Mich. Comp. Laws §§ 445.901 *et seq.* provided that "unfair, unconscionable, or deceptive methods, acts, or practices in the conduct of trade or commerce are unlawful." *Id.* at § 445.903(1).

410.   Among the acts the MCPA prohibits is "causing a probability of confusion or of misunderstanding with respect to the authority of . . . an agent to negotiate the final terms of the transaction." *See id.* at § 445.903(m).

411.   In connection with transactions (d) through (o) identified in paragraph 392, assuming that Fidelity had in fact terminated Nations Title's agency, Fidelity failed to give proper notice that it had done so, thereby creating the probability of confusion or misunderstanding about Nations Title's authority to issue CPLs and close transactions on Fidelity's behalf.

412.   As a direct and proximate result of Fidelity's conduct, Fremont was damaged in an amount not yet determined, but believed to be in excess of $3,800,000.

## PRAYER FOR RELIEF

**WHEREFORE**, with respect to Counts I through X of this Complaint, Plaintiff does hereby pray for the following relief against Defendants, jointly and severally, as follows:

(A)   a trial by jury of appropriate number;

(B)   with regard to all claims arising under the Racketeer Influenced and Corrupt Organizations Act, 18 U.S.C. §§ 1962(a), (c) and (d), Plaintiffs pray for compensatory damages in an amount to be proven at trial, that the amount of said damages be trebled, and that plaintiff be awarded prejudgment interest, attorneys' fees, costs, and such other relief as is just and proper, all pursuant to 18 U.S.C. § 1964(c);

(C)   with regard to all claims of common law fraud, Plaintiff prays for compensatory damages in an amount to be proven at trial, and that plaintiff be awarded prejudgment interest, punitive damages, costs, and such other relief as is just and proper;

(D)   with regard to all claims of civil conspiracy, Plaintiff prays for compensatory damages in an amount to be proven at trial, and that plaintiff be awarded prejudgment interest, punitive damages, costs, and such other relief as is just and proper;

(E)   with regard to all claims of aiding and abetting fraud, Plaintiff prays for compensatory damages in an amount to be proven at trial, and that plaintiff be awarded prejudgment interest, punitive damages, costs, and such other relief as is just and proper;

110

(F)     with regard to all claims of statutory conversion, Plaintiff prays for three times actual damages in an amount to be proven at trial, and that plaintiff be awarded attorneys' fees, costs, and such other relief as is just and proper;

(G)     with regard to all claims of breach of contract, Plaintiff prays for compensatory damages in an amount to be proven at trial, and that plaintiff be awarded prejudgment interest, costs, and such other relief as is just and proper;

(H)     with regard to all claims of negligence, Plaintiff prays for compensatory damages in an amount to be proven at trial, and that plaintiff be awarded prejudgment interest, costs, and such other relief as is just and proper;

(I)     with regard to all claims of negligent hiring/retention, Plaintiff prays for compensatory damages in an amount to be proven at trial, and that plaintiff be awarded prejudgment interest, costs, and such other relief as is just and proper; and

(J)     with regard to all claims under the Michigan Consumer Fraud Act, Plaintiff prays for compensatory damages in an amount to be proven at trial, and that plaintiff be awarded prejudgment interest, attorneys' fees, costs, and such other relief as is just and proper.

111

**FREMONT REORGANIZING CORP.**

By:      /s/ Michael C. O'Malley
One of its attorneys

Michael C. O'Malley (P59108)
KALLAS & HENK P.C.
43902 Woodward Avenue, Suite 200
Bloomfield Hills, Michigan 48302
(248) 335-5450, Ext. 217
momalley@kallashenk.com


C. Philip Curley
Cynthia H. Hyndman
Robert L. Margolis
ROBINSON CURLEY & CLAYTON, P.C.
300 S. Wacker Drive
Suite 1700
Chicago, Illinois 60606
(312) 663-3100


Larry J. Caldwell
Julia Vohl Islas
Keith R. Denny
CALDWELL LAW FIRM
1380 Lead Hill Boulevard
Roseville, California 95661
(916) 677-4254